|  |  |
|---|---|
| 36 | 325 |
| 76 | 40 |

## NATIONAL PAHQUIOQUE BANK *vs.* FIRST NATIONAL BANK OF BETHEL.

A bank organized under the United States currency act as a national bank had failed to redeem its notes, and the comptroller of the currency, under the provisions of the currency act, had appointed a receiver who had taken possession of its assets and its affairs were being wound up. A creditor presented a claim against the bank to the receiver, who disallowed it, and the creditor thereupon brought suit upon it against the bank. Held that the proceedings of the comptroller had not produced a forfeiture of the franchise of the bank and a dissolution of the corporation, and that therefore the suit would lie against it.

A dissolution of a corporation by forfeiture can only be effected by judicial proceedings against the corporation, taken for that purpose, a hearing or an opportunity for a hearing had, and a judgment of forfeiture had thereon.

A dissolution of a corporation by winding up, or other act of its stockholders, or by limitation, or in any mode except legislative repeal, or judicial decree, does not affect the rights of creditors.

The presentation of a claim against a national bank in the hands of a receiver,

and the disallowance of the claim by the receiver, is not conclusive in respect to the validity of the claim, and is no bar to an action at law by the creditor.

The claim of a creditor bank against a national bank in the hands of a receiver was for notes and bills sent by the plaintiffs to the cashier of the defendant bank for collection. The plaintiff bank was a holder of the paper for collection, but had paid its full amount to other banks from which it was received. The cashier of the plaintiff bank had given notice to the cashier of the defendant bank to protest and return all paper not paid, but the paper of one *S*, which had been sent by the plaintiff bank to the cashier of the defendant bank for collection and charged to the latter and posted in the account against the defendant bank, was not paid by *S*, and was not protested or returned or any notice of its non-payment given to the plaintiff bank. A semi-monthly statement of the account was sent by the cashier of the plaintiff bank to the cashier of the defendant bank and its correctness acknowledged by the latter. Held, that the plaintiff bank had a right, after a reasonable time had elapsed without notice of non-payment or a return of the paper, to charge the amount to the defendant bank and to recover in assumpsit for an account stated.

By collusion of the cashier of the defendant bank with *S* in fraud of his bank, the paper of *S* in the hands of the cashier was not paid, nor entered upon the books of the defendant bank, nor brought to the knowledge of the directors, and the drafts of third persons furnished to the plaintiff bank to provide for the payment of the balance due from the defendant bank, and which in large part were not paid, were furnished by *S* through the defendant's cashier. Held that, as the cashier of the defendant bank received the paper sent by the plaintiffs for collection, and had ostensibly the power usually given to cashiers of banks, he made the defendant bank liable to the plaintiff bank for the amount of the paper of *S* which he retained without collection, protest or notice.

In such a case the plaintiffs could not be affected by the fraud of the cashier of the defendant bank unless knowledge of it at the time could be brought home to them.

Assumpsit upon the common counts for money had and received by the defendants and on an account stated ; brought to the Superior Court, and tried on the general issue, with notice, closed to the court. The court found the following facts :

The plaintiffs and defendants were corporations organized as banking associations under the laws of the United States, the former having a capital of $250,000 and the latter a capital of $60,000. The defendant bank, when the account in dispute commenced, was a corporation for banking purposes, under the laws of this state, and doing business under the name of "The Hatters' Bank," and so continued until the 15th day of March, 1865, when it was converted into a national

banking association under the laws of the United States, under the corporate name of "The First National Bank of Bethel," and as such continued to transact the business of a national banking association until the 21st day of February, 1868, when it failed to redeem some of its circulating notes, which were presented for payment, and thereupon appropriate proceedings were had, which resulted in the appointment, on the 26th day of February, 1868, of Edgar S. Tweedy, as receiver, by the Comptroller of the Currency of the United States, which appointment he accepted, and under the direction of the Comptroller took possession of all the assets of the defendant bank, and has ever since continued in such possession. And the Comptroller caused notice to be published, calling upon all claimants to present and make legal proof of their claims against the bank.

Subsequently and within a proper time the plaintiff bank presented its claim, being the identical claim here in suit, to the receiver for allowance; but the receiver disallowed the same, and gave notice thereof to the plaintiff bank before the commencement of the present suit, and made his report to the Comptroller of the Currency, stating his action upon the claims presented to him.

The plaintiffs' claim is for notes, drafts, and checks sent by the plaintiff bank to the cashier of the defendant bank for collection, of which the plaintiff bank was a holder for collection, but for which notes, drafts and checks the plaintiffs had paid to other banks or individuals from whom the same were received by them, the full amount thereof.

During the time that the account in dispute was accruing, one William A. Judd was the regularly appointed and acting cashier of the defendant bank. As cashier he had no other authority to bind the defendant bank by his acts than that which is by law inherent in the office of cashier, and such as may be found or implied from the facts hereinafter stated.

In June, 1865, the defendant bank adopted the following by-law, which has ever since remained in force: "The cashier of the bank shall be responsible for all moneys, funds and valuables of the bank, and shall give bond with sureties, to

be approved by the board, conditioned for the faithful performance of his duties as such cashier." The directors of the defendant bank in June, 1865, adopted the following by-law : " There shall be a standing committee, to be known as the exchange committee, consisting of the president, cashier, and one director appointed by the board every six months, to continue in office and to act until succeeded, who shall have power to discount and purchase bills, notes and other evidences of debts, and buy and sell bills of exchange, and who shall, at each regular meeting of the board, make a report of the bills and notes discounted and purchased by them since their last previous report." This by-law was never repealed or rescinded, but after January, 1866, was practically disregarded, and the cashier was not reappointed, nor did he act as one of the committee.

It was a custom during most of the time the accounts in dispute were accruing for the cashier of the plaintiff bank and the cashier of the defendant bank to strike a balance on the books of their respective banks, of their mutual accounts as they stood at the beginning and middle of each month; which were adjusted between the cashiers by correspondence, and the transmission of checks and drafts sufficient to balance the same. These semi-monthly balances were usually in favor of the plaintiff bank, and were as represented on the bill of particulars, and were from time to time admitted by the cashier of the defendant bank to be correct; but no other officer and no director of the defendant bank had knowledge of the state of accounts between the two banks or of the acknowledgment of their cashier ; nor was any authority in fact ever given to make any such acknowledgment, or in any way to recognize the correctness of the account; nor did the books of the defendant bank disclose the true state of the accounts between the parties. The directors of the defendant bank were never consulted and never took any action or made any inquiry as to the mode of providing for the payment of any balance due to the plaintiff bank, or how such accounts stood between the parties, but the cashier was the only officer of the defendant bank who attended in any way to this branch

of the business. The original entries on the plaintiffs' books were all in the name of "William A. Judd, Cashier," but were posted on the ledger to the account of the defendant bank.

On the 28th day of February, 1865, there was due from the defendants to the plaintiffs, on account of notes, drafts and checks sent by the plaintiffs to the defendant bank for collection, a balance of $25,083.17; to provide for the payment of which balance, Judd, as cashier of the defendant bank, on that day caused to be delivered to the plaintiff bank four drafts, drawn by J. T. Fulton on E. Robinson, and accepted by the latter, and endorsed by Nathan Seeley and by Judd as cashier; one of the drafts being dated Feb. 15th, 1865, at sixty days, due April 19th, 1865, for $5,000; one draft dated Feb. 20th, 1865, at sixty days, due April 23d, 1865, for $5,000; one dated Feb. 21st, 1865, at sixty days, due April 24th, 1865, for $3,000, and one dated Feb. 25th, 1865, at sixty days, due April 29th, 1865, for $5,000.

The net proceeds of these drafts amounted to the sum of $17,779.33, which sum was credited to the account of "Wm. A. Judd, Cashier." The drafts were not discounted or owned by the defendant bank, and the name of the defendants does not appear upon the paper.

Payments to apply on the above drafts were made to the plaintiffs from time to time by other parties to the paper than Judd; and for the balance the drafts were renewed from time to time, all the renewals being indorsed by Judd as cashier, and by Nathan Seeley; but other new parties to the paper were from time to time added, without the knowledge or consent of any officer or director of the defendant bank, except Judd, the cashier. And the new parties to the renewal notes were obtained by the president of the plaintiff bank without the previous knowledge of Judd. The above drafts, by payments from time to time, had become, at the commencement of the present suit, reduced to the sum of $8,900, but none of the payments, either to apply on the principal or interest of the drafts or renewals thereof, were made by Judd.

Since the suit was commenced a dividend has been received by the plaintiffs on account of the drafts, from the insolvent

estates of Nathan and Isaac H. Seeley, amounting to the sum of $1,424.35, leaving a balance now due the plaintiffs from the defendants, upon the account above named, of $7,475.65, unless the drafts so received as aforesaid constituted payment of the original account in contemplation of the law.

There was no agreement between the parties that the plaintiffs should receive them as payment.

Neither the president, directors, nor any officer or agent of the defendant bank except Judd, had any knowledge whatever of the above drafts, or the renewals thereof, or of the indorsement of the same by Judd as cashier ;· and Judd had no authority to make such indorsements, unless such authority should be implied by law from the facts here found ; and the books and papers of the defendant bank contained no entry whatever respecting any of the drafts, or the renewals thereof. And the plaintiff bank never communicated to the defendant bank or its directors, or any of its officers, except Judd, the · fact that any of the drafts, or the renewals thereof, or any part thereof, remained unpaid, prior to January, 1868, or that the balance of the account of Feb. 28th, 1865, was unpaid ; and has never returned or offered to return, to the defendant bank, any of the drafts, or the renewals thereof.

On the 1st of October, 1867, in addition to the above mentioned claim, the plaintiffs claimed, by an account sent to Judd, as cashier of the defendant bank, a balance of $42,-431.01, accruing from notes and checks sent by them to the defendant bank for collection. To provide for the reduction of this balance, Judd, as cashier, but without the knowledge or consent of the directors, or any officer of the bank, drew five checks on the defendant bank, for five thousand dollars each, three being dated October 4th, 1867, and two bearing date Oct. 5th, 1867, all signed " Wm. A. Judd, Cashier," payable to " W. P. Seeley, Cashier, or order," W. P. Seeley being at the time, and ever· since, the cashier of the plaintiff bank ; which checks, amounting in the aggregate, to the sum of twenty-five thousand dollars, were credited to " Wm. A. Judd, Cashier," reducing by this sum the above balance, and were charged to the loan account to " William A.

Judd, Cashier;" and on the 31st day of December, 1867, another check was drawn by Judd as cashier, for ten thousand dollars, also without the knowledge or consent of the directors, or any officer of the bank, signed and payable in the same manner as the first named five checks, and in like manner credited to "William A. Judd, Cashier," and charged to loan account to "William A. Judd, Cashier." No agreement was made between the parties to receive the checks as payment, other than such as may be implied from the facts here found. These checks have never been paid, or any part thereof, and are still held by the plaintiffs, and have never been presented to the defendant bank for payment, and the plaintiffs have never delivered or offered to deliver to the defendant bank any of the checks.

The defendant bank, its officers and directors, had never authorized Judd to sign or issue these checks, or any checks whatever on the defendant bank, and he had no such authority at any time, unless such authority can be implied by law from the facts here found. Judd was the only officer of the defendant bank who had any knowledge of the above balances, or of the balances from time to time claimed by the plaintiffs to be due from the defendant bank. The books of the defendant bank were kept by Judd, and did not disclose the true state of the accounts as claimed by the plaintiffs and acknowledged by Judd.

The items in the plaintiffs' account which are disputed by the defendants, consist of the checks and notes of one Nathan Seeley, which from time to time were sent by the plaintiffs to Judd, as cashier of the defendants, for collection, which notes and checks were upon the defendant bank, or payable thereat, and were all charged to the defendants, except where they were protested, or notice given to the plaintiffs of non-payment. The cashier of the plaintiff bank had given notice to the cashier of the defendant bank, requesting the latter to protest all such notes and checks as were not paid and return them; but in fact a large amount of the checks and notes of Nathan Seeley, so sent to Judd as cashier for collection, and which were charged to the defendants on the plaintiffs'

account, were never collected by the defendants, and never paid by Seeley, and Seeley had no funds in the defendant bank or elsewhere from which they could be paid or collected, but such notes and checks were never, at any time, protested for non-payment, or returned to the plaintiffs, nor were the plaintiffs in any way notified of the fact of non-payment, unless such notice may be inferred from the facts here found. The notes and checks of Seeley which were not paid were not entered in any way upon any of the books of the defendant bank, and no director or officer of the defendant bank, (other than Judd,) had any knowledge of the existence of any such checks or notes, or that the plaintiffs had charged to the defendants such notes and checks.

The cashier of the plaintiff bank had never seen an indorsement by Judd as cashier of any notes or bills except those held by the plaintiffs, and had never seen any checks drawn by Judd as cashier upon the defendant bank except those held by himself. Nathan Seeley, during all the time the account in suit was accruing, was a depositer and customer at the plaintiff bank and often overdrew his account.

A considerable portion of the above mentioned checks and notes of Nathan Seeley is embraced in the plaintiffs' account, prior to the giving by Judd of the before mentioned checks amounting to thirty-five thousand dollars.

Judd, as cashier of the defendant bank, a short time before the appointment of Tweedy as receiver of the bank, without the knowledge or consent of any of the other officers of the bank, took from Nathan Seeley his note, indorsed by Isaac H. Seeley, for the amount of the notes and checks of Nathan Seeley sent to the defendant bank for collection and not collected. The receiver presented the note of Nathan Seeley against the insolvent estates of Nathan and Isaac H. Seeley, for the benefit of whom it should concern, and has, since the commencement of the present suit, received a dividend from those estates upon the same.

Sundry amounts necessary to be ascertained before the final determination of the case, or that might become so in the opinion of the Supreme Court, were left for further enquiry

after the opinion of the Supreme Court should have been obtained.

If, upon the foregoing facts, the Supreme Court should be of the opinion that the plaintiffs may by law recover in this action their entire account as presented, then the court found the same to be correct, and that at the commencement of the suit there was and still is due from the defendants to the plaintiffs, to balance accounts, the sum of $57,395.84, together with a balance of interest amounting, on the 1st day of March, 1868, to $929.66, making in all the sum of $58,325.50, with the lawful interest accruing from and after the first day of March, 1868. But if the court should be of the opinion that the above mentioned drafts or checks constituted in law payment *pro tanto* of the account, or if the amount represented by the notes and checks of Nathan Seeley, not collected by the defendants, cannot be recovered in this action, then the court found the amount due the plaintiffs to be such balance as should be left after deducting from the plaintiffs' account as above stated such sum or sums, with interest thereon, as cannot, in the opinion of the court, be properly included in the account, or recovered in this action; or, if such sum or sums so rejected should in the aggregate exceed in amount the balance of the plaintiffs' account as above stated, that then nothing was due from the defendants to the plaintiffs, but a balance due from the plaintiffs to the defendants, equal to the amount of such excess.

The question whether this case ought to be dismissed for want of jurisdiction, and if not, what judgment ought to be rendered in the case, and all questions of law arising upon the foregoing facts, were reserved for the advice of this court.

*O. S. Seymour* and *Taylor*, with whom was *Sanford*, for the plaintiffs.

*C. B. Goodrich* of Massachusetts, and *Averill*, with whom was *Brewster*, for the defendants.

BUTLER, J. This case comes before us on a finding of

facts by the court below, and a reservation of the questions arising thereon for our advice, pursuant to the provisions of our statute.

The first question reserved is whether the case ought to be dismissed for the want of jurisdiction.

It appears from the facts found that prior to the commencement of this suit the defendant bank had failed to redeem its notes, and that the Comptroller of the currency, proceeding in accordance with sections 46 to 50 of the currency act, had found it to be in default, had declared the bonds deposited with the government to secure the circulation forfeited, had appointed a receiver who had taken possession of its assets, and that its affairs were being wound up. It further appears that the plaintiff bank presented its claims to the receiver, who denied their validity and disallowed them, and thereupon the plaintiffs brought suit to determine their validity. The suit is defended by the receiver, by direction of the Comptroller of the treasury, in the name of the defendants for the benefit of the stockholders and creditors. They set up in their notice, and urge in argument, a want of jurisdiction in the court, because the proceedings of the Comptroller in the premises, pursuant to sections 46 to 50, produced a forfeiture of the franchises and a dissolution of the defendant corporation, and therefore no suit can lie against it, even to determine the validity of a demand by a creditor. We think that this claim is opposed to the well-settled principles and analogies of the common law, without support in any of the provisions of the act and contrary to its express provisions.

1. By the principles of the common law an absolute and unqualified dissolution of a corporation by a decree of forfeiture or legislative repeal, extinguishes all debts due to or from it, and puts an end to all its rights of action and property, and it can no longer sue or be sued or do any lawful act. To prevent a harsh operation of this rule, it is also a well-settled principle that a dissolution by forfeiture can only be effected by judicial proceedings against the corporation taken for that purpose, a hearing or an opportunity for a hearing had, and a judgment of forfeiture rendered thereon. For the protection

of creditors it is also a well-settled rule that a dissolution of a corporation by winding up, or other act of its stockholders, or by limitation, or in any mode except legislative repeal or judicial decree, does not affect the rights of creditors; and that as to them, and their right to enforce their claims, or determine their validity, by suit or otherwise, the corporation will be deemed to continue in existence.

With these principles in mind we listened attentively during the argument of counsel, and have since carefully examined their extended brief, to discover the *modus operandi* by which the absolute dissolution claimed was or could be effected by the winding up proceedings pursued in this case. On this vital point of the claim their ideas do not seem to be clear or consistent. In the opening paragraph of the brief it is said : " Its franchises and every corporate capacity had been taken away." How taken, is not there stated. In the next paragraph it is said that " the *refusal to redeem its bills constituted a forfeiture of its franchises*, which, acted upon by the Comptroller, produced a dissolution of the corporation." The *action* of the Comptroller was confined to the winding up prescribed in sections 46 to 50, commencing with the appointment of an agent to examine into the default, and will end with the final order for the distribution of assets. At what particular point of *time* in his proceedings, and by what particular *act* the dissolution was produced, is not stated, and cannot be surmised. In another place it is said : "The *action* of the Comptroller under sections 46 to 50, unless he is enjoined by a district, circuit or territorial court of the United States, *operates to divest* the association of *every corporate franchise* or capacity which it originally possessed, including suits by and against it; it divests the corporation of its assets by transfer to the receiver for the use of creditors after satisfying the United States to the extent of its claims proved to the satisfaction of the Comptroller, and a distribution of any surplus to the shareholders and their representatives, and not to the corporation. The result of these provisions is a dissolution of the corporation. They are as effectual for this purpose as an express declaration that thereupon the corporation

should be dissolved." From this quotation it would seem to be the idea of the counsel that dissolution was the result of *completed action* by the Comptroller, which has not been had in this case. In conformity to this claim, it is said in another place : " These sections authorize the Comptroller under certain circumstances to close up the business of an association, which winding up, closing up, involves a dissolution of the corporation." That the winding up of the affairs of a corporation produces *practically* the death of it, may be conceded ; but it is not that absolute and technical *dissolution* which the law recognizes as extinguishing all its rights and its existence, so that it cannot be sued by a creditor. In another place the idea is advanced that the association and its assets are " *seized* by the Comptroller," which seems to imply that the franchise is taken by him, and in still another place " that a corporation cannot exist which has been legally divested of every corporate franchise, and of every asset, by the transfer thereof to another, in pursuance of the statute under which it was incorporated." This idea of the *transfer* of the *franchise* to the *receiver* with the assets is an intelligible one, and would doubtless put an end to the corporation as an implied legislative repeal if clearly authorized ; but there is nothing in the act which justifies that claim. It is doubtful even whether the receiver has a legal title to the assets, for he cannot dispose of them without an order from a federal court, and the avails are to be paid immediately to the Treasurer of the United States. But however that may be, the act merely directs him to *take possession* of the *assets*, and the franchise of the corporation is not included in that term. We are unable to discover therefore from anything that has been urged, by what mode of operation known in the law the proceedings in question can produce that absolute and technical dissolution of a corporation which is produced by a judgment of forfeiture or by a legislative repeal, and bars a suit by a creditor.

2. This claim of the defendants finds no support in any of the provisions of the act.

There are three special cases in which the Comptroller is

authorized to appoint a receiver and wind up the affairs of associations for defaults of duty, and one authorizing him to compel an institution to wind up its affairs, besides the provision in question. The first is found in section 12th, and relates to a deficiency in the surplus. The second is in section 15th, and relates to a deficiency of capital. The third is in the 31st section, and relates to the keeping up of the required reserve. The fourth is in section 32d, and relates to a failure to name and keep a place of redemption. These are all cases of default merely. In no one of them, nor in that relating to a redemption of the bills, nor anywhere in the act, is there the slightest intimation that these defaults shall be considered causes of forfeiture and effect a dissolution.

The fundamental and essential principles of the common law alluded to were well understood by the then Secretary of the Treasury and the jurists upon the committees of Congress who assisted in framing the act, and they are recognized upon its face. The act was a most important and far-reaching one. It was intended to provide a substitute system of banking and currency for the whole country, and a new substitute body of banking associations, all of which were to become connected and blended in the most intimate manner with all its business operations and trade. They did not intend to leave anything to implication, and the act is remarkably clear and specific in all its provisions, and it is quite too much to ask that we should hold that they intended that the winding up of the affairs of a corporation by the intervention of a receiver should operate to produce a dissolution *per se*, with all the consequences attending a dissolution by judgment of forfeiture. If such had been their intention they would undoubtedly have expressed it.

3. And that such was not their intention clearly appears from express provisions in the act.

It has ever been the policy of the people of this country to afford to every man full and ample opportunity for the determination and enforcement of all his personal rights, and rights of action and of property. This policy is recognized

in every state constitution, and in the seventh amendment of the constitution of the United States. Important rights are never, except in cases of special necessity, submitted to the conclusive decision of one man, or of a board of men, without a right of appeal to some judicial tribunal, or other opportunity to review the decision. It would therefore have been extraordinary indeed, if in framing and adopting so important a measure, the power of conclusively determining the rights of creditors against insolvent associations, whatever their intricacy or amount, should have been given to a single officer of the government, who, under our system, is quite as likely to be a mere politician as a jurist, without any remedy against interest, relationship, bias or caprice. On looking at the act we find, as might have been expected, that such power is not given to the Comptroller, as has been claimed in the argument. He is authorized to give notice to all persons to present their claims and to make legal proof thereof, but he is not authorized to determine their validity, so as to conclusively bind the parties. On the contrary, the common law right of every man to have his claim investigated and determined in a court of justice, is recognized and provided for. The Comptroller is to pay a dividend on all such claims as may have been proved to his satisfaction, or " *adjudicated in a court of competent jurisdiction,*" and also to make further dividend as aforesaid, on all claims " previously proved or *adjudicated.*" It is perfectly apparent from these provisions, and from the absence of express authority to the Comptroller to make a conclusive decision, that it was the intention of Congress to leave the right of the creditor to a judicial determination of the validity of his claim, at his election, or upon disallowance, in full force and unimpaired.

But there are other express provisions which are conclusive upon this point. It is provided in the 8th section of the act, that every association formed under it " shall have succession by the name designated in its organization certificate, for the period of twenty years from its organization, unless sooner dissolved, according to the provisions of its articles of association, or by the act of its shareholders owning two-thirds

of its stock, or unless the franchise shall be forfeited by a violation of this act." The 53d section provides that "if any of the directors shall knowingly violate, or permit its agents to violate, any of the provisions of the act, all the rights, privileges and franchises derived from it shall be thereby forfeited." And it further provides that such violations shall be determined by a federal court, at the suit of the Comptroller, before the association shall be declared dissolved. The defendant corporation has not been dissolved by lapse of time, or any provision of its articles of association, or action of its shareholders, or any judgment of forfeiture. Why then is it not an existing corporation within the spirit and comprehensive terms of the act ? The failure to redeem its notes has been claimed in the argument to have been a "cause of forfeiture." Whether it was so or not we need not decide. If it was not the argument falls. If it was, then in order to dissolve the corporation there must be proceedings instituted for that purpose by the Comptroller, and a judgment of forfeiture obtained. This has not been done, and by the express provisions of the 8th section the corporation exists.

The point has been made upon the brief and in the argument, that the presentation of claims to the receiver and their disallowance by him was conclusive in respect to their validity. In regard to this it is sufficient to say, that we find nothing in the act which expressly or by necessary implication authorized that officer to adjudicate conclusively, or at all, upon the claims of the creditors.

For these reasons we are of opinion that the court below had jurisdiction and that the case ought not to have been dismissed.

We come now to the merits of the case as presented by the finding.

It appears from the finding of the court that the plaintiffs' claim was for "notes, drafts and checks sent by the plaintiff bank to the cashier of the defendant bank for collection, of which the plaintiff bank was a holder for collection, but for which notes, drafts and checks the plaintiff had paid to other

banks or individuals from whom the same were received by the plaintiffs, the full amount thereof." It further appears that the cashier of the plaintiff bank had given notice to the cashier of the defendant bank, requesting the latter to protest all such notes and checks as were not paid, and return them, but that notes, drafts and checks of one Nathan Seeley, which were the notes, drafts and checks charged in the plaintiffs' account, were received by the defendant bank, and although not paid by Seeley, were not protested or returned, or any express notice of their non-payment given to the plaintiff bank. The notes, drafts and checks so sent to the cashier of the defendant bank, were charged to the cashier and posted in the account against the defendant bank and the indebtedness was admitted by the cashier of the latter. These facts present a prima faciê case in favor of the plaintiff bank against the defendant bank; and as the notes, drafts and checks were all sent to be collected of the drawer of them, and the plaintiffs were entitled, after a reasonable time elapsed without notice of non-payment or return to charge them up as collected, in account, we are of opinion that the plaintiffs can recover on the common counts and on the facts for an account stated.

But other facts were proved, which the defendants claim were sufficient to absolve them from liability. On the 28th day of February, 1865, there was due from the defendants to the plaintiffs on account of notes, drafts and checks sent by the plaintiff bank to the defendant bank for collection, a balance of $25,083.17, to provide for the payment of which the cashier of the defendant bank gave to the plaintiffs sundry drafts, made by third persons, the avails of which as collected were credited to the defendants upon the books of the plaintiffs. These drafts were endorsed by the cashier of the defendant bank, and the sum of $7,475.65 remains unpaid thereon, and that amount the defendants claim should be applied in extinguishment of so much of the plaintiffs' account. This claim is not founded upon any agreement that the drafts should be received in payment, for it is expressly found that there was no such agreement. But on the ground

that the balance of the 28th of February, 1865, was made up of the said notes, drafts and checks of Nathan Seeley, sent by the plaintiff bank to the defendant bank for collection; that by collusion of the cashier of the defendant bank with Seeley in fraud of his bank, these notes, drafts and checks were not paid, nor entered upon the books of the defendant bank, or their existence brought to the knowledge of its directors; and that the drafts of third persons furnished to the plaintiff bank to provide for the payment of the balance of February 28th, 1865, were furnished by Nathan Seeley through Judd, the defendants' cashier, and were never the property of the defendant bank.

We do not think it material to inquire whether the bank was liable for Judd's endorsement upon the drafts, or into the extent of the authority given by the by-laws of the bank to Judd, the cashier, for the transaction of its business. It is perfectly apparent that the cashier of the defendant bank received the notes, drafts and checks sent by the plaintiffs for collection; that he had ostensibly the powers usually given to the cashier of such an association; that it was his duty to collect them or to protest and return them; and that by retaining them without collection, protest or notice, he made the defendant bank liable to the plaintiffs for their amount. The finding shows gross fraud on his part, by colluding with Seeley to permit his paper to accumulate in the bank unpaid; by failing to enter the paper upon the books of the bank, and to inform the directors of its possession and non-payment; and in permitting the accounts of the plaintiffs to accumulate in such an unusual manner and to such an unusual extent, without informing them of it. It also shows gross negligence in the officers of the defendant bank, in entrusting its entire management to Judd. But these facts do not constitute a defence, unless *knowledge* of them can be brought home to the plaintiffs.

The transactions were loose, and looking to the amount of the defendants' capital unusual, and it would seem that suspicion at least must have arisen in the minds of the officers of the plaintiff bank; but the court below has not found

knowledge or even suspicion, and there are no facts found which will justify us in inferring such knowledge as matter of law.

We are not able therefore to perceive in this finding any legal defence against the claims of the plaintiffs. There is nothing found in relation to the reception, collection or continued retention of the drafts furnished in 1865 which can be said to have extinguished the original indebtedness of February 28th, 1865, or bar the plaintiffs from the recovery of the balance of that indebtedness. Nor is there anything in the subsequent conduct of the business between the two banks, although very unusual in its character, which would justify us in holding, as matter of law, that the plaintiffs should be barred from recovering the balance of account which subsequently accrued and was admitted by the defendants' cashier from time to time. It is not our province to find facts and we must decide the questions of law presented to us by the finding as it stands.

For these reasons we advise judgment for the plaintiffs.

In this opinion the other judges concurred.