## WILLIAM S. WELLS ET AL. *vs*. THE HARTFORD MANILLA COMPANY.

First Judicial District, Hartford, May Term, 1903.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

A breach of an executory contract by anticipation occurs only when there is a distinct, unequivocal, and absolute refusal to perform the promise by one party, before the time for its performance has arrived, and an equally clear acquiescence in or acceptance of such renunciation by the other. In other words, the contract remains a subsisting one until the parties have mutually elected to treat it as broken, and have given unmistakable evidence of such election.

In December, 1899, the Burgess Sulphite Fibre Company agreed, in writing, to furnish, and the defendant to receive, 1,300 tons of paper pulp, to be shipped as the defendant might order it, "but in any event all to be shipped before January 1st, 1901." Up to April 1st, 1900, the defendant had ordered and received something less than 300 tons, and then telegraphed and wrote the Fibre Company not to ship more until ordered, as it, the defendant, had more pulp than it could then use. Subsequent correspondence developed a claim on the part of the defendant that under some oral understanding with an agent of the Fibre Company it was bound to take only so much pulp as it might need in its business, a claim repudiated by the Fibre Company, who insisted that the full amount must be taken within the time limited, and urged the defendant to renew its shipping orders and at shorter intervals. After further correspondence, in which the defendant explained that it could not dispose of its product upon a dull and falling market, that it had a large supply of raw material on hand, but hoped before long to be able to take and use a large amount of pulp, and the Fibre Company again complained of the defendant's failure to order further shipments and to pay for the pulp already shipped, the Fibre Company, on July 17th, 1900, brought suit against the defendant, which a few days later was placed in the hands of a receiver upon complaint of the plaintiffs. The receiver declined to take the undelivered balance of the pulp, and closed out the business and sold the property of the defendant without doing so. *Held:* —

1. That upon these facts there was no such distinct and absolute refusal by the defendant to take the balance of the pulp within the time limited, as was necessary in order to constitute a breach of the contract by anticipation, and therefore no valid claim for

damages for such a breach existed when the receiver was appointed.

2. That the receiver was not bound to adopt the contract, and his election to abandon it did not, under the circumstances disclosed in the record, entitle the Fibre Company to have its claim for damages, which was based on the loss of prospective profits, allowed as a general claim against the estate.

It would seem, however, that such an after-accruing claim might properly be allowed, payable out of any balance left in the receiver's hands after the satisfaction of general claims existing at the date of his appointment, and before such balance is returned by the receiver to the debtor; and especially so in a case where there are difficulties in the way of a complete remedy by suit.

Argued May 8th—decided July 24th, 1903.

APPEAL by the receiver of the defendant from a judgment of the Superior Court in Hartford County (*Roraback, J.*), in receivership proceedings, allowing a creditor's claim for damages for the defendant's breach of contract to receive merchandise ordered by it. *Error and cause remanded.*

December 15th, 1899, the Burgess Sulphite Fibre Company, manufacturer of paper pulp, and the Hartford Manilla Company, manufacturer of paper, entered into a written contract, known as contract *A*, by which the first-named company agreed to furnish, and the last-named company to receive, 1,300 tons of sulphite pulp of a designated standard, at the price of $2.25 per 100 pounds, f. o. b. Woodland Switch Station, Burnside, Conn., or National Paper Mill, Ballston, N. Y. The contract contained the following provision : " Shipments as ordered, but in any event all to be shipped before Jan. 1, 1901."

The same day another contract, known as contract *B*, for 220 tons of bleached sulphite pulp was made. The price agreed upon was $3 per 100 air dry pounds. The conditions as to delivery were identical with those contained in contract *A*.

Between the date of the contract and April 2d, 1900. 278½ tons of pulp were ordered and delivered under contract *A*. Some payments were made on account of these deliveries, but at the time of the appointment of the receiver

for the Manilla Company $4,178.13 was due and unpaid for such delivered pulp.

After April 2d, 1900, no shipments were made, by reason of the Manilla Company's orders to that effect, although the Fibre Company was willing and anxious to make them and urged that the necessary orders therefor be given.

About March 1st a controversy arose between the parties as to the Manilla Company's obligations under the contract, the controversy being precipitated by the fact that the latter company was only ordering shipments at the rate of one car a week, while the contract amount averaged two cars a week and the original expectation of the parties was that such should be the rate of shipment. A falling market for pulp, and a diminishing and suspended business by the Manilla Company, aggravated the situation. The Fibre Company conceded that its vendee had the right to order shipments at its pleasure, as long as a reasonable time was given to fill the entire order, but its correspondence urging increased shipments developed a claim on the part of the Manilla Company that by verbal agreement it was not to be held to order more pulp in the whole than its business needs required. Correspondence followed until April 3d, when the Manilla Company telegraphed that it was overcrowded with pulp, and directed shipments to stop. A letter which supplemented the telegram assigned, as the reason for the cessation of shipments, that the mill was shut down and that seven carloads of pulp were already on hand, and added: " Do not ship us any more until we order it forward. We cannot take in another pound." The correspondence between the parties, as to the vendee's right under a verbal agreement to limit the total of its orders to it needs, continued. The Fibre Company admitted the Manilla Company's right to suspend orders for the time being, but insisted upon the latter's duty to receive the whole amount ordered, and to give its orders therefor in a reasonable time. The latter company contended for its right to limit its total orders as indicated, but at all times admitted its obligation to take from the Fibre Company all the pulp it, the Manilla

Company, used, and repeatedly stated that it was so doing and intended to do so. May 16th the Manilla Company wrote that the situation at the mill was somewhat improved, that it was running practically half time and working off the accumulated stock of material. Meanwhile the Manilla Company had fallen behind in its payments, and that matter, also, became the subject of correspondence. May 26th, in a letter urging prompt payment, the Fibre Company wrote as follows: "We note that we have made no shipments on your contract of December 15th since April 2d. We would appreciate your shipping orders in accordance with conditions of contract at an early date." May 31st the Fibre Company wrote a still more urgent letter, calling attention to the suspension of shipping orders, reciting what shipments had been made, and concluding as follows: "We would, therefore, repeat the request that we have made you several times, to favor us with shipping instructions at an early date, so that we may govern our shipments in accordance with your requirements so far as possible. We presume it would be much more satisfactory to you to have this go forward at regular intervals, instead of holding it for shipment during the last few months." June 6th the Manilla Company acknowledged this letter, and wrote: "We propose, however, to take all the sulphite which we use, at contract price, during the year 1900, of you." June 8th the Fibre Company replied, saying, among other things: "Your attitude in regard to taking the fibre which you agreed to take is inexplicable to us, and we trust, therefore, that we may have the pleasure of meeting you in New York, as suggested in ours of June 5th, so that we may talk matters over and see just where we are." June 19th the Fibre Company wrote again, urging payment of its account, and adding: "We want you to pay as you have agreed to pay, and to call on us for shipment at the rate you have agreed to take, and which we have bound ourselves to ship." June 23d the Manilla Company replied as follows: "Yours of the 19th inst. at hand. As we have already explained to you, that on account of the product of our mill having been taken by one concern, and that product having

been shut off without notice, and being obliged to depend on an open market (a falling and dull market) for our orders, and with a large supply of raw material on hand, you can readily understand why we have not been able to order and consume more sulphite.  We are having some orders, but are still running short time.  We hope to be able to run full time very soon, and also hope to use a large quantity of sulphite.  We have already stated to you that we are buying sulphite from you only, and shall continue to take all our supply from you.  If you are inclined to treat us fairly, as you have expressed, we think this explanation of the case should be accepted and satisfactory to you."  Subsequently two letters passed with relation to the unpaid account, when, on July 2d, the Fibre Company wrote threatening suit if payment was not promptly made.  In this letter was contained this sentence: "In the meantime you are taking no fibre whatever on your contracts as you agreed to take."  July 17th the Fibre Company brought suit. July 31st a receiver was appointed for the Manilla Company upon the complaint of William Wells and Company, dated July 28th.  No pulp was ordered by or delivered to either the Manilla Company or its receiver after April 2d.  The receiver refused to receive the undelivered balance of said pulp, and closed out the business and sold the property of the company without doing so.

None of the bleached pulp called for by contract $B$ was ever ordered or shipped.  Prior to April 17th the Fibre Company were unable to furnish it.  On that day it wrote the Manilla Company that the mill for its production had started, and asking for shipping orders.  None were given.

The court allowed as a preferred claim the costs of said suit, to wit, $66.20, and a general claim of $9,144.13, in which was included said sum of $4,178.13, and the sum of $4,966, being the amount assessed as damages "by reason of the failure of the Hartford Manilla Company to receive the balance of 1,241½ tons of pulp" called for by the two contracts, said damages being assessed at $4 per ton.

The appeal was taken from the allowance of said $4,966 only.

*Edward D. Robbins*, for the appellant (M. S. Chapman, receiver).

*Charles H. Briscoe* and *John R. Buck*, for the appellee (Burgess Sulphite Fibre Co.).

PRENTICE, J. The allowance of that portion of the claim of the Burgess Sulphite Fibre Company appealed from, is supported before us in argument upon two grounds, to wit: (1) that there was such a breach of the contracts, before the appointment of the receiver, that the claimant was then entitled to maintain an action thereon against the Manilla Company and recover full damages as for contract broken; and (2) that the refusal of the receiver to abide by the contracts after his qualification, itself furnished a basis for the allowance.

The first contention assumes the existence of a matured claim prior to the receivership proceedings. If this assumption is correct, the right to an allowance of the claim follows. The claimant's brief makes the date of the breach April 3d, when the telegram stopping shipments was sent. "This refusal to receive any more goods," the brief says, "gave the Fibre Company the right to bring suit immediately for damage on the whole contract, and to recover whatever damages it might be able to show it had suffered by reason of not being permitted to deliver the goods under the contract down to January 1st, 1901."

This contention, we think, is not well founded, whether it be made as of April 3d, or any other subsequent date prior to the appointment of the receiver. The contracts called for no regularity in the vendee's demands for the pulp. It did not forbid suspensions of such demands. Shipments were, by the express provisions of the agreement, to be made as ordered, the only limitation being that the whole amount was to be shipped before January 1st, 1901. This limitation naturally implied that the orders for shipments should be so given that they might be reasonably filled before January 1st, 1901. There could by no possibility be implied there-

from an agreement that the vendee should so make his orders that shipments might be made at a uniform rate during the term, or that there should be no periods within which shipments should be suspended. The parties may have anticipated a uniform demand, but they did not contract for it, and the contracts control. As five of the thirteen and one half months covered by the agreements remained, when the receiver was appointed, it is clear that the vendee had not at that date by anything it had done, whether by way of delaying or suspending shipments, as distinguished from what it had said, acted in excess of its rights under the contracts or in violation of their terms. Neither had it put itself in a position or created a situation for the parties which rendered performance of the contracts impossible. So much we understand the claimant to concede.

If any conditions were created which authorized a suit by the Fibre Company as for contract broken, it was because of a renunciation of the contracts by the Manilla Company, of such a character and under such circumstances as to amount in law to a breach by anticipation. This brings us to a consideration of the law upon that subject.

In *Hochster* v. *De La Tour*, 2 E. & B. 678, Lord Campbell promulgated the doctrine that a party to an executory contract might, before the time for its execution had arrived, break it by a renunciation of it communicated to the other party. Two years later the same judge, in passing upon the facts of a similar case to which the same doctrine was sought to be applied, took occasion to intimate that the renunciation, to be effectual, must be an unequivocal one, and refused to treat the contract as a broken one within the meaning of the rule laid down in *Hochster* v. *De La Tour*, for the reason that the promisee had, after the promisor's renunciation, continued to insist upon performance. *Avery* v. *Bowden*, 5 E. & B. 714. The doctrine thus enunciated by Lord Campbell has been the subject of much discussion, sometimes with approval, sometimes with disapproval, and sometimes in a noncommittal attitude. The result of this discussion has been that the later English cases and the de-

cisions of the United States Supreme Court are in harmony in their approval of the principles thus laid down. This approval, however, has been accorded only in view of important limitations to be placed upon the general doctrine that there may be a breach by a refusal to perform in advance of the time of performance. The necessity for these limitations did not escape Lord Campbell's attention, as the case of *Avery* v. *Bowden*, 5 E. & B. 714, clearly shows; but their importance has since that case been more emphasized, and the unreason of the rule, without them, more clearly recognized. These limitations are that the renunciation must consist in "a distinct and unequivocal absolute refusal to perform the promise," and that it "must be treated and acted upon as such by the party to whom the promise was made." It is held that a mere assertion that the party will be unable or will refuse to perform his contract is not sufficient, and that if the promisee afterwards continues to urge or demand a compliance with the contract he has not put himself in a position to sue for a breach. *Smoot's Case*, 15 Wall. 36, 48; *Dingley* v. *Oler*, 117 U. S. 490; *Roehm* v. *Horst*, 178 id. 1; *Johnstone* v. *Milling*, L. R. 16 Q. B. 460, 467.

In the case last cited, Lord Esher gives an interesting summary of the result of the English cases and the theory which underlies them, as follows: "In those cases the doctrine relied on has been expressed in various terms more or less accurately; but I think that in all of them the effect of the language used with regard to the doctrine of anticipatory breach of contract is that a renunciation of a contract, or, in other words, a total refusal to perform it by one party before the time for performance arrives, does not, by itself, amount to a breach of contract but may be so acted upon and adopted by the other party as a rescission of the contract as to give an immediate right of action. When one party assumes to renounce the contract, that is, by anticipation refuses to perform it, he thereby, as far as he is concerned, declares his intention then and there to rescind the contract. Such a renunciation does not of course amount to a rescission of the

contract, because one party to a contract cannot by himself rescind it, but by wrongfully making such a renunciation of the contract he entitles the other party, if he pleases, to agree to the contract being put an end to, subject to the retention by him of his right to bring an action in respect of such wrongful rescission. The other party may adopt such renunciation of the contract by so acting upon it as in effect to declare that he too treats the contract as at an end, except for the purpose of bringing an action upon it for the damages sustained by him in consequence of such renunciation. He cannot, however, himself proceed with the contract on the footing that it still exists for other purposes, and also treat such renunciation as an immediate breach. If he adopts the renunciation, the contract is at an end except for the purposes of the action for such wrongful renunciation; if he does not wish to do so, he must wait for the arrival of the time when in the ordinary course a cause of action on the contract would arise. He must elect which course he will pursue."

These limitations contained in the rule prevent a party to a contract from occupying an equivocal position with respect to it. The contract remains a subsisting one until the parties have mutually elected to treat it otherwise, and have given unmistakable evidence of such an election. A renunciation does not create a breach; there must be an adoption of the renunciation. The renunciation must be so distinct that its purpose is manifest, and so absolute that the intention to no longer abide by the terms of the contract is beyond question. The acquiescence therein must be as patent. There must be no opportunity left to the promisee to thereafter insist upon performance, if that shall prove more advantageous, or sue for damages for a breach, if events shall render that course the more promising.

So far as State jurisdictions are concerned, Lord Campbell's rule has been adopted with more or less careful statement, in several: *Windmuller* v. *Pope*, 107 N. Y. 674; *Gray* v. *Green*, 9 Hun, 334; *Zuck & Henry* v. *McClure & Co.*, 98 Pa. St. 541; *Roebling's Sons' Co.* v. *Lock Stitch Fence Co.*, 130

Ill. 660 ; *Crabtree* v. *Messersmith,* 19 Iowa, 179 ; *Hume* v. *Conduitt,* 76 Ind. 598 ; *Platt* v. *Bland,* 26 Mich. 173 ; *Davis* v. *Grand Rapids School-Furniture Co.,* 41 W. Va. 717. Dissenting views are expressed in *Daniels* v. *Newton,* 114 Mass. 530 ; *Stanford* v. *McGill,* 6 N. Dak. 536.

In this State the question is an open one. Although the principle adopted by the English and the United States Supreme Court is not one of the clearest logic, nevertheless, when taken with its limitations, it has such support in practical considerations and in strong legal reasons and authority, that we have no hesitation in adopting it as the law of this State. Without its limitations, we conceive that it has no basis in reason, or otherwise.

It remains to apply the rule to the facts in the case at bar. In doing so we are met at the outset with the inquiry as to whether the Manilla Company ever made " a distinct and unequivocal absolute refusal to perform " its agreement. On April 3d it telegraphed to stop shipments, assigning as a reason that it was overcrowded with pulp. This telegram was followed by a letter confirming it. This letter gave the added instructions not to ship more " until we order it forward. We cannot take in another pound." This action was, as we have seen, clearly within the company's rights under the contract, and there is nothing in either telegram or letter to suggest a refusal to abide by the contract. Clearly there was here no renunciation as claimed. The subsequent conduct of the Fibre Company plainly discloses that it had no such understanding, and as plainly that it had no disposition to treat the contract as broken. Three months pass during which the Manilla Company sends no shipping orders. This of itself was no breach of the contract. Covering the same period, however, there is an extended and instructive correspondence. From it, taken in connection with the failure to send shipping directions, it might well have been surmised that the 1,570 tons of ordered pulp would not be called for before January 1st, 1901 ; but that remained a subject for surmise ; it never became a certainty. The Manilla Company never refused to take any

additional pulp; it never said it would refuse to take the whole amount. It was continually saying that it was proposing to take all that its business needs demanded. The most that it ever said was that it would refuse to take more than this amount. But who can say, or rather who could then say, that the needs of its business would not exhaust the whole order. We may strongly suspect—the Fibre Company may have had a suspicion amounting to a firm belief on its part—that such would not prove to be the case, but suspicion and belief are not substitutes for certainty. The suspicion or belief that the Manilla Company would not call for its entire order could only furnish the foundation for the inference, more or less strong, that the statement of the company, that it would not take more pulp than it could use, would in the end result in a breach of the contract. To use this inference of a probable future breach as the equivalent of a present, absolute, unequivocal renunciation of the contract, or refusal to abide by it, is plainly without justification. The trouble with the claimant's position in this regard is that it attempts to transform suspicion, belief, and inference, into things distinct, certain, and absolute, and thus create an unequivocal and absolute renunciation of an agreement out of imaginings and conclusions. This both the letter and spirit of the rule forbids. The facts in the case of *Dingley* v. *Oler*, 117 U. S. 490, furnish a striking analogy to those in the present case, and the conclusion of the court in that case, that there had not been a distinct and unequivocal renunciation, and the reasoning on which the conclusion is based, are peculiarly instructive.

These conclusions render it unnecessary to inquire whether the claimant ever treated or acted upon the contract as a broken one. It is clear that it never did so prior to the receiver's appointment, unless it was in the bringing of its suit on July 17th. In view of the scant information which the record contains concerning the character of that suit, it would be idle to discuss the possible questions which might be presented.

We have next to consider whether the conduct of the

receiver in refusing to adopt the contract and carry out its provisions furnishes a justification for the judgment appealed from.

With respect to this aspect of the case, it is to be observed at the outset that the court has expressly and most explicitly based its judgment of allowance upon a claim matured and existing at the time of the receiver's appointment. Both the memorandum of judgment and the judgment-file are careful to emphasize this fact. There has been no allowance of an after-accruing claim. Without noticing the possible consequences of this situation upon the claimant's contention now under review, let us consider that contention upon its merits.

The claimant, upon the authority of adjudicated cases, admits that the receiver, after his appointment, was not bound to adopt the contract, but had the right, subject to the control of the court, to abandon it, if in his opinion it would be undesirable or unprofitable to adopt it. *United States Trust Co.* v. *Wabash Western Ry. Co.*, 150 U. S. 287, 299; *Dushane* v. *Beall*, 161 id. 516; *Central Trust Co.* v. *East Tennessee Land Co.*, 79 Fed. Rep. 19; *Commonwealth* v. *Franklin Ins. Co.*, 115 Mass. 278; *New Hampshire Trust Co.* v. *Taggart*, 68 N. H. 557; *Spencer* v. *World's Columbian Exposition*, 163 Ill. 117; *Woodruff* v. *Erie Ry. Co.*, 93 N. Y. 609; *Scott* v. *Rainier Power & Ry. Co.*, 13 Wash. 108.

It contends, however, that a receiver who thus elects to abandon an executory contract binds the estate in his hands to respond for any damages such abandonment may occasion to the other party. This is interpreted to mean that such party is entitled to the allowance of a general claim against the estate to the extent of his damage. This conclusion, if sound, would seem to reduce the privilege of election, which a receiver admittedly enjoys, to microscopic proportions in most cases. Save in those comparatively rare ones where specific performance would for equitable reasons be decreed, the privilege of a receiver would thus be hard to distinguish from that which the ordinary individual or corporation enjoys. Ordinarily a contracting party is privileged to break his

contract and pay the resulting damage. The Manilla Company was privileged to do that with respect to this contract. Evidently the rights of receivers in this regard, which the courts have been so solicitous to preserve, are not of so shadowy a character.

We do not, however, wish to be understood as saying that there may not be frequent cases where the act of a receiver in not adopting an executory contract would entail such injury upon the other party to the contract, by reason of what he had already done under it and relying upon the faith that it would be carried out, that a claim against the estate would, upon the principles of equity and good conscience which underlie receivership proceedings, be recognized and allowed. There are, however, no such elements of damage in this case. The claim of the Fibre Company is based upon the loss of prospective profits. The loss was the loss of a good bargain. The damage claimed and allowed was the value of that bargain. The Fibre Company secured a contract with the Manilla Company for the sale of a quantity of pulp, at a price several dollars a ton in excess of its market price when the receiver was appointed. The receiver naturally did not regard that as a contract profitable for his estate to adopt. His conduct in not adopting it deprived the vendor of an opportunity to sell 1,200 tons of pulp for something like $5,000 more than it was then worth, and pocket the profit. No other element of damage appears in the case.

In such a case the privilege of the receiver in acting for the best interest of the estate and its creditors, not only extends to the right to elect what contracts he will adopt, but also to make the election without at least subjecting the fund required for the satisfaction of existing claims of creditors to a charge for damages. In other words, the consequences of the election, under such circumstances, may not become the occasion for the allowance of a general claim entitling the claimant to share with other creditors the assets of the estate. Otherwise, there might be danger that a portion of an estate which was needed to pay creditors whose claims were already fixed ones might thus be exhausted to

their injury. If, however, the condition of an estate was such that the allowance of a claim of this character would not encroach upon the assets necessary to satisfy other creditors, and there was to remain in the hands of the receiver a balance after the expenses of settlement and claims were paid, quite a different situation would present itself, to which other considerations would apply. *Chemical Nat. Bank* v. *Hartford Deposit Co.*, 161 U. S. 1. The questions which such a situation would present are suggested in the last cited case. That case decides that a right of action would exist against the contracting party, if it continued to have legal existence, and thereby any balance left after the receiver's settlement be held to answer to the claim. See also *Pahquioque Bank* v. *Bethel Bank*, 36 Conn. 325. An equally pertinent question is not decided, and that is whether a claim such as we have been considering could not be properly allowed, payable out of any balance left in the receiver's hands after the satisfaction of the general claims, and before such balance is paid over by the receiver to the contracting party. That such a course could and ought to be pursued in a case where there are difficulties in the way of a complete remedy by suit, seems clear. Beyond this the question calls for no consideration in this case.

The practical effect of these principles, it is plain to see, is that claims existing at the time of the receiver's appointment have a priority over after-accruing ones of the kind under discussion, arising from the permissible acts of a receiver in his efforts to safeguard the interests of the estate in his hands and thereby protect the interests of creditors. The other party to a disavowed contract will not thus be deprived of his rights to compensation for any wrong done him, to be obtained in some manner, unless by the obtaining of them he would divert to himself that which by a higher right belongs to others. His rights are simply subordinated to those of others standing in a higher position.

The equity of this is apparent. No one suffers unless the insufficiency of assets compels it. If such insufficiency exists, creditors holding claims the liability for which is fixed

when the receiver is appointed are not obliged in any degree to yield to others who seek to secure to themselves profits which the future, by reason of a good bargain, might have in store for them.

The claimant's brief urges that the privilege of election which a receiver has is one which he may exercise only by the authority or approval of the court, and that any not so authorized or approved would be ineffectual to protect the estate from its consequences. It is unnecessary to consider this claim further than to observe that there is nothing in the record to suggest that this receiver's action in the premises was either in excess of authority, or unapproved, and that such a situation is not to be presumed.

There is error in the allowance of that portion of the claim appealed from, and the cause is remanded for a correction of the judgment in accordance with that conclusion.

In this opinion the other judges concurred.