## W. R. GRACE & CO. v. FORD MOTOR CO. OF CANADA, Limited, et al.

(Circuit Court of Appeals, Ninth Circuit. February 6, 1922.)

No. 3721.

1. **Shipping ⬤108—Shipper held not in default when suit commenced.**

Under a contract for the shipment of 6,200 tons of automobiles and parts, under which the shipper was notified that the vessel would be ready for loading on June 27th, and that loading was to be completed not later than June 29th, where the shipper on June 27th had 4,650 tons in San Francisco for shipment, and which were actually conveyed on the steamer, and had freight on the pier with which to begin loading, but the vessel could not possibly have loaded any cargo on the 27th, 28th, or 29th, there was no actual breach of the contract by the shipper when suit was commenced on June 27th.

2. **Shipping ⬤108—Correspondence held not to show "June loading" did not mean loading before the end of the month of June.**

Under a shipping contract providing for "June loading," correspondence between the parties *held* not to show that the quoted term was not intended to mean a loading before the expiration of the month of June, but only a loading as soon as was feasible or convenient after the expected return of the steamer from a voyage.

[Ed. Note.—For other definitions, see Words and Phrases, June Loading.]

3. **Shipping ⬤108—Notice that full cargo contracted for would not be furnished held not anticipatory breach.**

Under a contract for the shipment of 6,200 tons of automobiles and parts, a letter from the shipper, stating that 4,075 tons was its entire cargo, and announcing its purpose to withhold loading thereof if the owner of the vessel intended to hold it for freight on 6,200 tons, was not a renunciation of the contract or the expression of a purpose to breach it, and where the owner in reply stood strictly on the contract, and stated that it was ready to perform and accept such quantity as might be delivered, and that it would hold the shipper responsible, a suit could not be maintained as for an anticipatory breach.

4. **Admiralty ⬤66—Leave to amend not granted, when there is no suggestion that any other evidence could be adopted.**

Where no actual or anticipatory breach of a contract of shipment had occurred when suit was brought, and it did not appear that the owner of the vessel by which the goods were to be shipped had a cause of action for breach of the contract at any time, and there is no suggestion that other evidence on the merits may be adduced, permission to amend the pleadings on the theory that the suit was prematurely brought will not be granted.

Appeal from the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

Libel in admiralty by W. R. Grace & Co., a corporation, against the Ford Motor Company of Canada, Limited, and another. From a decree dismissing the libel (278 Fed. 951), the libelant appeals. Affirmed.

The appellant brought a libel in rem and in personam against the appellees and against certain automobiles and parts, for breach of a contract of affreightment entered into between the appellant and the appellees on February

25, 1916. The Ford Motor Company of Canada will be herein designated the appellee. The contract was for the shipment of 6,200 tons of automobiles and parts from San Francisco to New Zealand and/or Australia. It contained this provision: "Shipment per American Steamship Cacique, June loading; when vessel is closer at hand, will advise you more definitely as to exact loading date." The negotiations prior to entering into the contract were these:

On February 23, 1916, the Ford Motor Company of Canada telegraphed to the San Francisco office of the Ford Motor Company, a separate corporation, suggesting the consignment of freight for "May and June sailing." Davis, traffic manager of the Ford Motor Company at San Francisco, after negotiating with the appellant, wired the appellee: "If you can take 6,200 tons for early June, can close with Grace Company same rate Wellington and Sydney or Wellington and Melbourne." To which the appellee on February 25 answered: "Accept Grace offer 6,200 tons. Confirm, advising names and dates of sailing." On the same day the appellant prepared the contract of affreightment which was sued upon. On April 3, 1916, the appellee advised the Ford Motor Company of San Francisco that it had but 4,284 tons for shipment on the steamer Cacique, adding: "However, we expect certain additions from Australia, which will no doubt bring our specifications up to the required amount." On May 1 the appellee wired the San Francisco Ford Motor Company that 5,658 tons would be sent forward for shipment under the contract. The shipments, however, totaled only 4,575 tons.

On June 1 the appellee wrote the appellant, advising that 4,075 tons had been forwarded for shipment on the Cacique, and that the appellee had effected an arrangement with the Union Steamship Company for the transfer of 1,500 tons, and that 524 tons had been procured elsewhere, which made up a total of 6,099 tons, adding that it was the appellee's understanding that the Cacique would leave on June 14, and again that it would sail on June 24, and that the appellee's plans had been made accordingly. The letter directed attention to the fact that the sailing date as then learned had been postponed until July 10, and on that account the appellee disclaimed liability if it should not be able to supply the full 6,200 tons. The letter called attention to the fact that the contract "calls for June loading, which in the parlance must necessarily mean June shipping." The appellant answered on June 6, denying the appellee's contention that the contract called for June shipment, but demanding that the appellee's shipment must be alongside the Cacique on June 27, ready for loading "as fast as ship can receive."

On June 14 the appellee advised the appellant that, if the latter should attempt to hold for dead freight the tonnage then actually shipped by the appellee, the latter would decline to load any of the cargo. The appellee then added its contention that the contract of February 25 was not binding upon it, for the reason that the Cacique had taken out a clearance for July 5, instead of loading and clearing in June. The letter added: "Our shipments of 4,075-ton quantity will be ready and alongside your steamer on June 27, as indicated by you." On June 22, 1916, the appellant advised the appellee's agent: "Supplementary to our letter of June 5, advising that steamer Cacique will be ready for loading June 27: Please note the delivery of 6,200 tons automobiles and parts, full quantity your engagement under contract date February 25, must commence on that date, June 27, and be completed not later than June 29."

About that time 1,500 tons of the appellee's automobiles were delivered on the pier at which the Cacique was to dock. On June 24 the appellee's agent addressed another letter to the appellant, stating that 4,075 tons is the entire cargo for the Cacique, and that that would be withheld from loading if the appellant intended to hold it for the full freight of 6,200 tons. On June 26 the appellant telegraphed the appellee, insisting on full performance of the contract in every particular, and declaring its readiness to perform the same, and to accept such quantity of automobiles as might be delivered "and hold you responsible for all damages, including demurrage, which we may ultimately sustain by any breach of said contract."

On June 27, 1916, the Cacique arrived at San Francisco and docked at Pier 26. There was delay in unloading her inward cargo, and the unloading was not completed until July 8 at 6 p. m., after which the steamer was required to

go into dry dock for repairs. She returned to Pier 26 on July 12. The 1,500 tons of the appellee's automobiles still remained on said pier. No cargo was loaded on the Cacique before July 12. In the meantime, on June 27, at 4 o'clock in the afternoon, the appellant brought the present suit, and under its libel in rem seized the 1,500 tons of the appellee's goods, and by writ of attachment it levied upon 4,000 additional tons of automobiles of the appellee then in the possession of the Southern Pacific Company at San Francisco. On June 28, the day following the commencement of the suit, the appellant telegraphed the appellee: "Please take notice that, in accordance with our previous advices, the steamer Cacique was ready to load your cargo contracted for on February 25, 1916, on June 27, 1916, at 9 p. m. As you have failed to deliver the cargo alongside steamer as fast as vessel can load, demurrage at the rate of $3,000 per day commences on the day and at the hour last mentioned."

Andros & Hengstler, Louis T. Hengstler, and F. W. Dorr, all of San Francisco, Cal., for appellant.

W. F. Williamson, of San Francisco, Cal., for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). It must be borne in mind that on June 22 the appellant had advised the appellee that the Cacique would be ready for loading on June 27, and that the loading was to commence on that date and be completed not later than June 29. The court below held that the contract required that the cargo must be loaded in the month of June, 1916, that there had been no actual breach of the contract by the appellee at the time when the suit was commenced, that there had been no breach of the contract by the appellee in anticipation of the time of performance, and that the appellant could not proceed in rem against a portion of the cargo that had been delivered and received as freight and at the same time prosecute its libel on the theory of an anticipatory breach.

[1] The appellant contends that there was an actual breach of the contract by the appellee. We think the contention cannot be sustained. On June 27 the appellee had in San Francisco for shipment on the Cacique 4,650 tons of automobiles, and when the vessel finally did sail, in late July, these automobiles were conveyed on the steamer. It is true that the appellee had failed to deliver the full cargo of 6,200 tons as contracted for, but the full performance of the appellee's obligation was not due at the time when the suit was commenced. The appellee had until and including June 29 in which to furnish the cargo. The notice required that loading must begin on June 27 and be completed not later than June 29. There were appellee's goods on hand with which to begin on June 27. The appellee could not be in default at the time when the suit was commenced. The evidence is undisputed that during the 27th, 28th, and 29th the appellant could not possibly have loaded any cargo. She had arrived on the 27th with a cargo of 7,900 tons, which she did not unload until the afternoon of July 8, and thereafter she was ordered into dry dock by Lloyd's surveyor, and she was not seaworthy or in condition to take on cargo for the appellee until after July 12.

[2] But the appellant contends that the contract did not call for June loading; that the term "June loading" was not intended to mean

loading in the month of June, but as soon as was feasible or convenient after the expected return of the Cacique from her voyage to Oriental ports. The preliminary correspondence between the parties clearly indicates that the appellee was looking for transportation of its goods in early June, and that it assented to a contract which provided for June loading. The authority of Davis to engage space was expressly limited, as the appellant well knew, for not later than a June sailing. The appellant drew the contract, and inserted the words "for June loading," a phrase used evidently as equivalent to June sailing, and we do not see how it can be held to mean anything other than its plain terms import. Gray v. Moore (C. C.) 37 Fed. 266; Davison v. Von Lingen, 113 U. S. 40, 5 Sup. Ct. 346, 28 L. Ed. 885; Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366.

The appellant finds in some of the correspondence expressions which at first glance give color to its contention that the contracting parties had in contemplation a possible delay in loading until early in July. Thus, on June 13, Mr. Davis wrote to the appellee, referring to the delay of the Cacique, and saying:

"It is now our hope that she will even be as late as the 10th of July, as we wired recently. * * * We sincerely hope that you will be able to fill the space with your own cars, rather than let it go to another concern for a lower figure."

The inference to be drawn from the letter is that the writer hoped that the delay of the Cacique would relieve the appellee from liability for damages for its failure so far to furnish the whole cargo it had contracted to furnish, and very probably he had in view, in the event of such delay, the possibility of making up the shortage of the cargo so as fully to comply with the contract. We see nothing in the correspondence to indicate that the court below did not properly construe the contract as calling for a loading before the expiration of the month of June.

[3] But the appellant contends, and it alleged in its libel, that there was an anticipatory breach of the contract, in that the appellee in writing expressly refused to perform the same. The letter of the appellee of June 24, stating that 4,075 tons is the appellee's entire cargo for the steamer, and announcing the appellee's purpose to withhold loading of that cargo if the libelant intends to hold the same for the full freight of 6,200 tons, was not a renunciation of the contract, or the expression of a purpose to breach the same, and it was not accepted as such. The answer to that letter states that the appellant stands "strictly upon the contract," that it was ready to perform the contract, and was ready to accept such quantity of automobiles as might be delivered, that it would hold the appellee responsible for all damages, including demurrage, and that the appellant would not accept such smaller quantity as satisfaction of the contract, but only as the partial satisfaction "which it in fact is." The law applicable to the question of anticipatory breach is clear and well settled. In 6 R. C. L. 1025, it is said:

"In order to justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract, or of a covenant going to the whole consideration, and must be distinct, unequivocal, and

absolute. * * * The renunciation itself does not ipso facto constitute a breach. It is not a breach of the contract, unless it is treated as such by the adverse party."

Among the authorities which apply that rule are Dingley v. Oler, 117 U. S. 490, 6 Sup. Ct. 850, 29 L. Ed. 984; Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Smoots Case, 15 Wall. 36, 21 L. Ed. 107; Wells v. Hartford Manilla Co., 76 Conn. 27, 55 Atl. 599.

[4] The appellant argues that under the equitable practice in admiralty the libel should be sustained, even though it were prematurely brought, and that the appellant should be permitted to amend its pleading; but there is no suggestion that other evidence on the merits of the case may be adduced in addition to what is contained in the record. The difficulty which confronts the appellant is not a defect in its pleading, but the nature of the facts which have been disclosed. Obviously every fact relating to the merits of the controversy is before the court. The appellant cannot recover damages for an anticipatory breach, for the reason that the appellee did not renounce the contract, and the appellant did not accept the appellee's communication as a renunciation, but by its own words and conduct recognized the continuing existence of the contract. The appellant cannot recover for an actual breach of the contract, for the reason that no breach had occurred when the suit was brought. Nor does it appear from the facts disclosed that at any time the appellant had a cause of action for breach of the contract, since the evidence indicated its own failure to perform.

The decree is affirmed.