## THE OREGON.

### THE PALMS.

### THE OREGON et al. v. PITTSBURGH & L. A. IRON CO.

### THE PALMS et al. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. May 1, 1893.)

#### Nos. 34 and 35.

1. CHARTER PARTY—CONSTRUCTION—SEASON SERVICES—TOWAGE.
    Libelant chartered the propeller Oregon and the schooner Palms to carry ore between named ports, the contracts being executed at the same time, and each providing that the vessels should make as many trips as possible during the season. The contract with the Palms also provided that she should always be towed by some other vessel. The Oregon towed

the Palms the whole season, and also another schooner on most of her trips, the latter being one of her regular tows. *Held* that, as the libelants had knowledge of this towing, and failed to object to it, they cannot claim that it was a breach of the contract to make as many trips as possible.

**2. SAME—BREACH OF CONTRACT—CUSTOM.**

It was, however, a breach of the contract for the Oregon to tow other vessels besides these two, and the construction of the contract in this regard cannot be varied by evidence of a custom for propellers of her class to tow as many as five vessels, where it is not shown that they always tow more than one or two.

**3. SAME—CONTRACT FOR ACT OF THIRD PERSON.**

The Palms is equally liable for the breach of the contract by the Oregon in taking additional tows, especially when the managing owner of both vessels was the same person, for when he allowed the Oregon to take up tows in violation of the contract he made the owners of both liable for his act.

**4. SAME—RETURN TRIP—TAKING CARGO WITHOUT CONSENT.**

One of the stipulations of the contracts was that the vessel should take no cargoes on the return trip except with the consent of the charterers. In violation of this, they took on one trip cargoes of coal that delayed them some 10 days. It was shown that at the existing rates of freight it was more profitable for the owners to break their contract in this regard than to observe it. *Held*, that the owners' claim that at that season of the year loaded vessels could proceed faster than light ones, on account of the strong winds prevailing, is no excuse for the breach; especially when their testimony upon this point is contradicted.

**5. SAME—TERMS OF CONTRACT.**

As the contract makes no mention of the character of ore to be shipped, the owners cannot claim that the charterers themselves violated the contract by loading hard instead of soft ore, which cost less to carry.

**6. SAME—MEASURE OF DAMAGES.**

The evidence showed that the various delays caused the loss of one trip, and that in consequence the charterers, in order to fulfill their contracts, were compelled to charter other vessels at current rates of freight to carry the cargoes that should have been carried by these vessels. *Held*, that the measure of the charterer's damages was the difference between the freight stipulated in the charter parties and the freight so paid by them.

**7. SAME—OVERCHARGE—ADMIRALTY JURISDICTION.**

The charterers sold the tonnage of the Palms for one trip at a rate in advance of that stipulated in the contract, and her captain collected from the consignee the whole of the freight, and retained it. *Held* that, as this collection was incidental to the performance of the maritime contract sued on, it may, as to the excess of the charter rate, be regarded as an overcharge of freight; and its recovery is fully within the admiralty jurisdiction, as damages for breach of a maritime contract.

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

In Admiralty. Libels by the Pittsburgh & Lake Angeline Iron Company against the propeller Oregon and others and against the schooner Palms. There were decrees in the district court for libelant, which were affirmed on appeal by the circuit court. From the latter decrees respondents appeal. Affirmed.

Statement by TAFT, Circuit Judge:

These were two appeals from decrees of the circuit court for the northern district of Ohio, affirming decrees of the district court for the same district. The two cases have been heard together in the three courts, because the facts and the testimony in them are substantially the same. The testimony in the Oregon case was stipulated into the Palms record. The libels were filed in the district court by the Pittsburgh & Lake Angeline Iron Company.

a corporation operating iron mines on Lake Superior, against the propeller Oregon and the schooner Palms, to recover damages for similar breaches of similar contracts of affreightment, by which J. C. Gilchrist, who was the managing owner of both vessels, agreed to carry iron ore for the mining company. The Oregon contract was as follows:

### "Vessel Charter.

"Agreement between J. W. Moore, of Cleveland, Ohio, as managing owner of the vessel called the H. B. Tuttle, and Pittsburgh and Lake Angeline Iron Company, of Cleveland, O., made at * * *, this 15th day of February, 1886, witnesseth, that the said J. W. Moore, for the considerations hereinafter named, hereby agrees that said vessel shall carry cargoes of iron ore for the said Pittsburgh and Lake Angeline Iron Co. during the season of 1886, from Marquette, Mich., to Lake Erie ports, (not east of Erie,) at a rate of freight of one and 20-100 dollars ($1.20) per ton of 2,240 pounds. Said vessel shall carry no up loads without consent of Pittsburgh and Lake Angeline Iron Co., and shall make as many trips as possible on this contract. There shall be allowed four days' time for loading said vessel, and for furnishing a dock at which to discharge; the time to be reckoned from the hour when said vessel reported and was ready to load, until loaded, and from the time when reported at port of destination, and was ready to unload, until a dock was furnished. The time of such reporting in both cases not to date from an hour. earlier than 8 o'clock A. M., or later than 5 o'clock P. M.; Sundays, public holidays, and time lost in consequence of heavy seas, strikes, or any other causes beyond the control of * * *, excepted. When cargoes contracted by this vessel are delivered, if it shall be found that the time of detention exceeds the four days for trip, as above stipulated for, the said vessel shall be allowed a compensation for further detention, except for causes above stated, at the rate of five cents per gross ton of cargo for each day (of twenty-four hours) of such excess. The time of reporting, ready to load, and when loaded, with causes of detention, if any, shall be noted on the bill of lading in every instance. A special order for each cargo shall be obtained from the Pittsburgh and Lake Angeline Iron Co., at Cleveland, O. Said Pittsburgh and Lake Angeline Iron Co., in consideration of the above, hereby agrees to employ said vessel, and agrees to pay the freight as above mentioned.

"Pittsburgh and Lake Angeline Iron Co.

"J. H. Outhwaite, Secretary and Treasurer.

"J. W. Moore, Managing Owner.

"Cleveland, April 22d, 1886.

"The propeller Oregon is substituted for the propeller Tuttle in this contract by mutual consent.          J. H. Outhwaite, Secretary.

"J. C. Gilchrist."

The charter party for the Palms was exactly like the foregoing, with the following additional provisions:

"Said vessel to rate not lower than A2, * * * and to be constantly towed by some steamer."

The Oregon was owned by J. C. Gilchrist, Randall E. Schuck, Thomas Maytham, and William Landgraff. The Palms was owned by J. C. Gilchrist, Randall E. Schuck, and William H. Gilcher. Gilchrist was the managing owner of both vessels.

The libel against the Oregon, after setting out the contract, and an allegation of full performance thereof by the libelant, averred that the Oregon had violated the express stipulation of the contract by going, on the 15th of September, 1886, to Buffalo for a load of coal, without the consent of, and against the protest of, the libelant, whereby she lost so much time that, but for that delay, she could have made one more trip during the season, and she thus compelled libelant, in order to supply the deficiency, to charter other vessels to carry iron ore at a rate greatly in excess of the contract rate, to wit, $2.10. Another averment was that the Oregon, without the consent of the libelant, took in tow a great many vessels on her trips to and from Marquette, thereby preventing her from making as many trips as possible, and resulting in the loss of another trip.

In the libel against the Palms, in addition to the foregoing averments, it was charged that the captain of the Palms had collected from the consignee of the iron ore carried upon one of the trips, to whom the libelant had sold the tonnage for that trip, $104 more than the charter rate, which belonged to libelant as profit upon the sale of the tonnage, and which the captain turned over to respondents.

The answer of the respondents was—First, that the libelant had violated the contract in loading hard iron ore, when it was understood and agreed that the cargoes should be soft ore, which was cheaper to carry, and in shipping ore belonging to others than the libelant; and, second, that the vessels made as many trips as possible, and no act of respondents in violation of terms of the contract had caused any loss or damage. As to the $104 collected by the captain of the Palms, the respondents claimed that, as it was received on a trip in which the libelant had permitted another to ship ore, the respondents were entitled to collect and keep the going rates of freight from the real shipper.

The Oregon towed the Palms during the entire season, and made 12 round trips between Marquette and Cleveland.

It was conceded at the trial that the Oregon, on September 15, 1886, went with two tows, the Palms and the Marsh, from Cleveland to Buffalo, where the three vessels were loaded with hard coal, which was carried to Marquette. The libelant protested against this violation of the contracts before the vessels left Buffalo. The excuse offered at the trial was that in the rough weather of September the vessels made better speed when loaded, because the strong winds of that season would blow them out of their course if running light.

It was also conceded at the trial that, in addition to the Palms, the Oregon also towed the schooner Marsh throughout nine of the twelve round trips, and that on two of the three remaining round trips she towed a schooner in place of the Marsh, so that for only one round trip did she tow only the Palms. In addition to this, on ten half trips, the Oregon towed a third vessel. Libelees' witnesses admit that a second tow delayed the propeller a day and a half in a round trip, and that a third tow delayed her as much more.

The master in the district court found that the two vessels had violated their contracts, and lost one trip, by going to Buffalo for up loads of coal, and by towing the Marsh and other vessels, and fixed their liability for damages at the difference between the contract rate of freight and the going rates of freight which the libelant was compelled to pay to carry the cargoes for the lost trip. He also found for libelant against the Palms for $104. The district court confirmed the findings, and entered the proper decree, which was affirmed by the circuit court. The difference between the contract and going rates of freight when libelant bought tonnage to carry the cargoes for the lost trip was 80 cents a ton, making $840 damages chargeable to each vessel, as well as the $104 additional against the Palms.

Harvey D. Goulder, (F. H. Canfield, of counsel,) for appellants.

Henry S. Sherman, for appellee.

Before TAFT, Circuit Judge, and SAGE and SWAN, District Judges.

TAFT, Circuit Judge, (after stating the facts.) It is contended by appellants that the provisions of the charters that the vessels should make as many trips as possible did not prevent them from towing other vessels on their trips, because it was the custom for a propeller like the Oregon to tow two, three, and sometimes as many as five, vessels at a time. We do not see how such a custom could affect the construction to be placed on this contract. It may be very true that propellers of the power and tonnage of the Oregon are in the habit of towing three, four, and five vessels, but they do not always do it. Mr. Harvey Brown, in giving evi-

dence as one experienced in lake transportation, said that he had in his charge three propellers carrying iron ore between Marquette and Michigan, which towed only one vessel. Indeed, appellants' own witnesses admitted that the number of tows was varied from one to five. It is only reasonable to suppose, therefore, that the intention of the parties to the contract in inserting the stipulation that the vessel should make as many trips as possible was to prevent delays, as well by the towing of other vessels as by other causes. We may infer, from the fact that the two contracts were executed about the same time, and for the same purpose, that the parties expected the propeller named in one to tow the schooner named in the other, although there is no such express provision in either. The Oregon towed the Palms throughout the season. The libelant had full notice of it, and did not object. This is a practical construction of the contract by the parties that is quite conclusive. The Marsh was not carrying freight for libelant, but she and the Palms seem to have been the regular tows of the Tuttle, the propeller mentioned in the original contract, for which the Oregon was substituted, and there is no denial that the libelant knew she was being towed by the Oregon all summer. The libelant made no objection, and cannot be heard now for the first time to claim that this was a breach of the contract. There is no evidence to show, however, that libelant had any knowledge that the Oregon was towing other vessels, and we are satisfied that, in so far as this extra towage delayed the Oregon and the Palms, and made their trips less numerous, it was a violation of both contracts. It is objected on behalf of the Palms that her owners, who are not all the same as those of the Oregon, should not be responsible for the delay caused by the Oregon's taking up other tows, because the Palms could not control the propeller's action. There is no force in the objection. The Palms was under contract to make her trips as fast as possible. We have found from the surrounding circumstances that this meant as fast as possible with another tow and the propeller Oregon. In so far as the Palms' making the trip without delay depended on the conduct of the steamer, her owners, in effect, agreed that the steamer should do nothing to prevent it. There is nothing unusual or impossible in one person contracting with another that a third person shall do something. But here the case is even stronger, for the managing owner of the Palms and the managing owner of the Oregon were the same person. When he allowed the Oregon to take up other tows in violation of both contracts, he made the owners of the propeller and the schooner both liable for his act, because, as managing owner for the schooner, he necessarily consented to his own conduct as managing owner of the propeller. His was a general agency for the owners of the two vessels, and he represented both sets of owners fully and completely.

The evidence shows that the delay occasioned by towing third vessels was about three quarters of a mile an hour, or 18 miles a day. This would mean a reduction of speed of one eighth. Estimating the time for a half trip, exclusive of the time for loading, as

six days, though it was often longer, this would amount to a delay of about three fourths of a day for each half trip. There were ten half trips when the Oregon towed a third vessel in addition to the Palms and the Marsh, which made a delay in all, on this account, of seven days and a half. Some effort was made to show that extra tows were only taken up when no delay could occur. The captain of the Oregon said that he only took an extra tow when he calculated ahead, and found he would arrive at Marquette Saturday night, and no unloading could begin until Monday; or when he would arrive at the Sault canal too late to go through until the next morning. It was immaterial in such cases whether he arrived at night or the next morning, so far as the time to be consumed in the trip was concerned. The captain could only have referred in this excuse to tows which he took for short trips. The tows counted in the ten half trips we have been considering were towed all the way between Cleveland and Marquette, one way or the other; and it was impossible, with respect to a whole trip, to make such a calculation with any exactness. This excuse is of a piece with the excuse which Gilchrist and his captains offer for the flagrant and deliberate violation of the two contracts in going to Buffalo, and taking thence full up loads of coal on the Oregon, the Palms, and the Marsh for the ninth trip. They were ready to leave Cleveland on September 15th. Gilchrist went to the secretary of the libelant company, and informed him that he was going to send his vessels to Buffalo, to take cargoes of coal from there to Marquette. He was told that this was a violation of his contract. He intimated that he would do it anyhow. He says that he explained that in the heavy winds that were likely to prevail during the trip which covered the equinoctial season his vessels would make better time if loaded than light, 'and that on the previous trip up they had been delayed by being blown around by side winds, although the record shows that to have been one of his shortest trips. The libelant objected, and sent a written protest to Gilchrist. The captains of his vessels seek to sustain this explanation as a valid excuse, and argue that, even though a technical violation of the contract, it caused no delay. The district and the circuit courts evidently gave no credence to this claim, and rightly. Harvey Brown, who at this same time sent three propellers and their consorts, not very unlike in draught and tonnage to those of libelant, from Cleveland to Marquette, testifies that they had no difficulty of this kind, and made their trips very promptly. The excuse was late-born for the purposes of the case. The real reason for taking the coal was that freight rates for coal had risen so much that Gilchrist could make upwards of $1,500 by violating his contract. This is perfectly evident from his conduct in respect to his last—the twelfth—trip, when he again applied to Outhwaite, the secretary of the libelant, to take up a load of coal. Outhwaite's statement is as follows:

"At first I refused, but he threatened to repudiate these contracts if he was not allowed to take these up loads, saying that he knew he could make more money by breaking these contracts and carrying these up loads of coal than all

the damages we could recover against him by reason of the breach of the contract. At that time it was almost impossible to get vessels to carry ore by reason of the great demand for such tonnage, and it was absolutely necessary that we should have the ore to fulfill our contracts with other parties, and for this reason I was obliged to yield to his demands, and consent to these vessels carrying on this one occasion an up load of coal, as demanded by him."

A man who manifests such a total disregard of the obligation of his contracts cannot expect courts to look with favor or credence on the hypothetical excuses made by him or his employes for his flagrant and deliberate breaches of them. It is ample explanation of his conduct that it was more profitable for him to break than to keep his charter stipulations. The delay caused by taking an up load of coal was something more than 10 days. The vessels were ready to leave Cleveland for Marquette on the 15th of September. Instead of this, they went east to Buffalo, a distance of 200 miles, and did not leave there until the 18th. They were then a day's sail further away from Marquette than at Cleveland, so that, instead of leaving Cleveland on the 15th, as they ought to have done, they really began their trip from that point on the 19th,—a loss of four days. The vessels reached Marquette on the morning of the 27th of September, and reported at the dock of the libelant, ready to load, on the morning of the 2d of October. In other words, there was a delay of six days in unloading the cargoes of coal, a delay which obviously would not have happened had the vessels gone up without a cargo. Another labored effort is made by Gilchrist and his witnesses to show that the winds were so high and so adverse that he could not have left Cleveland before the 18th or 19th, even if he had not gone to Buffalo for the coal, from which the argument is made that his trip to Buffalo and back did not cause the loss of time. Gilchrist did not produce the logs of his vessels, and gave no explanation for their absence. He preferred to rely on the unassisted memory of his captains as to the exact direction and force of the winds during the four days, a year and a half before they testified. This would be unsatisfactory evidence at the best, but it loses all weight when considered in connection with the absolutely truthful data taken from the weather and wind records of the government signal service office at Cleveland, which are in direct conflict with it. Without commenting on the evidence more in detail, it is sufficient to say that it clearly shows a delay of seventeen days and a half, caused by extra tows and the coal trip to Buffalo, both of which were breaches of contract by the libelees. We make no account in this calculation of the delay caused by the weight of the cargoes of coal in the tenth up trip, though we do not doubt that the trip was a slower one for that reason. It is very significant that of the 12 trips which the two vessels made, but two occupied more than 18 days. These were the two when cargoes of coal were carried on the up trip, and they occupied 28 and 26 days respectively. Excluding these two trips, the average time of the round trips when no loads were taken was 15.2 days. It is quite clear that the 17 or 18 days consumed, as we have found, by Gilchrist in breaking his contracts would have enabled his vessels to have made at least one more trip.

The defense that the libelant violated its contracts in loading hard, instead of soft, iron ore, has nothing in it. The contract mentions no particular kind of ore, and the attempt of the respondents to insert such a limitation by oral evidence is entirely unwarranted. Moreover, respondents made no objection to the hard iron ore when it was being loaded, but only advance it now, when in search of excuses.

Were we in doubt, inasmuch as two courts have found the issue, which is purely of fact on conflicting evidence for the appellees and libelant, it would be our duty to follow their finding. Walsh v. Rogers, 13 How. 284; The Marcellus, 1 Black. 414; The Waterwitch, Id. 494; The Albany, 48 Fed. Rep. 565. But, as the whole case was vigorously reargued before us, we have thought it proper to review the evidence.

One of the chief objections by appellants to the decrees appealed from is the measure of damages enforced thereby. It is said that the correct measure is the difference between the market values of the two cargoes of ore at Cleveland and Marquette, less the contract rate of freight, whereas the measure adopted by the courts below was the difference between the contract rate of freight and the rate of freight which the libelant actually paid to transport the ore. Damages for breach of contract should be such compensation as will restore the injured party to the same pecuniary condition that he would have been in, had the contract been performed. Where one contracts with a carrier to transport ordinary merchandise, having a market value, from one point to another, the profit which both he and the carrier may reasonably expect him to make out of the transaction is the difference between the market value of the merchandise at the point of destination and the market value at the point of shipment, less the freight under the contract. The pecuniary difference between the shipper's condition with the contract performed and his condition if the merchandise is not shipped, but remains at the point of shipment, is this profit, which is, therefore, his legal damage. But it is a general rule that it is the duty of one party to a contract which has been broken by the other to use reasonable diligence to reduce the damages arising from the breach. If, therefore, in cases of freight contracts, the carrier refuses to perform, it is the duty of the shipper, if he can reasonably expect thereby to reduce his loss, to seek other means of transportation, and perform the contract himself. In such a case the difference between his actual pecuniary condition and that in which he would have been had the carrier transported the goods under the contract is, not the profit which he would have made had the contract been performed,—for the contract has been performed, and he has acquired the opportunity to sell his merchandise at the market value prevailing at the place of destination,—but it is the increased expense of performing the contract; that is, the difference between the contract rate of freight and the freight which he was actually obliged to pay to secure performance. And it would seem to be a good defense against a claim for profits lost by breach of a freight contract, that the shipper could have saved himself, or at any rate could have re-

duced his loss, by employing other means of transportation. This may be hardly consistent with Chief Justice Taney's opinion in Harrison v. Stewart, Taney, 485, but it is in accordance with the weight of modern authority. 2 Sedg. Dam. (8th Ed.) § 482. In such a case it would be necessary for the defendant to show that the shipper could reasonably expect to reduce his loss by other transportation. But it would hardly seem so necessary, in order to justify the shipper in seeking other means of transportation and charging the carrier with the increased freight, for him to show either that the profit from the executed contract would have equaled or exceeded the increase in the freight. When a shipper contracts with a carrier to transport merchandise, he is legally entitled to have his merchandise carried without regard to the question whether the transaction would have been profitable to him or not. Were the contract one which justified a resort to a court of equity for its specific performance, it certainly would not defeat the relief prayed for, that the result would be unprofitable to the complainant. Of course, there is a limit to the increased expense which the injured party may incur in doing what the other was obliged, under the contract, to do, and which he may charge to that other. The limit is suggested in the rule laid down in the leading case of Hadley v. Baxendale, 9 Exch. 341, under which damages for a breach are limited to such as would naturally flow from the breach within the reasonable contemplation of the parties at the time of making the contract. He cannot go to extraordinary and unreasonably excessive expense or take unusual means to accomplish that which the other party agreed to do, and thus impose on the other liability for damages out of all proportion to what either party might have reasonably expected as the loss from the breach. In Le Blanche v. Railway Co., 1 C. P. Div. 286, 302, Lord Esher, Master of the Rolls, then Mr. Justice Brett, used this language:

"We think it may properly be said that, if the party to perform a contract does not perform it, the other may do so for him, as reasonably near as may be, and charge him for the reasonable expense in so doing."

This was approved as a correct statement of the law by Mellish and James, Lord Justices, in the court of appeal, although on the facts of the case they held that not to be a reasonable expense which Brett, J., had deemed to be so. The limitation upon the right of one party to perform the contract on the default of the other to do so is well brought out in that case. There the plaintiff had bought a ticket entitling him to a passage to Scarborough, to arrive at a certain time. Connection was missed at Newcastle with the Scarborough train. Plaintiff would have had to wait an hour or two at Newcastle before resuming his journey by regular train, and would have arrived at Scarborough about two hours late. There was no special reason why he should reach Scarborough at the time agreed on. He nevertheless chartered a special train, and arrived at Scarborough a very little late. He sought to impose the heavy expense of the special train upon the company selling him his ticket. It was held that he could not do so, because the means selected by him to perform the contract on the default of the railway company involved

an outlay extravagant and out of proportion to the loss he would have sustained by waiting for a regular train. It was suggested that the proper standard for reasonableness of expense in such a case was that cost which the plaintiff would have incurred to avoid the delay under the same circumstances, if he had not expected to charge it to the railway company.

The case of Lake Co. v. Elkins, 34 Mich. 440, upon which appellants chiefly rely, was a case the decision of which went upon the same principles as that announced in Le Blanche v. Railway Co. There the contract was to carry three cargoes of salt from Bay City to Chicago by water. The defendant did not receive the cargoes, and the plaintiff was unable, because of the close of navigation, to obtain other lake transportation. He therefore shipped the salt in small lots, as he needed it, by rail to Chicago, and then sought to charge defendant with the difference between the contract rate of freight on the three cargoes and the cost of transporting the same quantity of salt by rail in small lots during the winter season. It would have been manifestly unjust to have charged defendant with this extravagant difference in the cost of freights. As compared with the means of carriage stipulated in the contract, that actually taken was excessive and unreasonably expensive, and the difference was far beyond any loss naturally flowing from the breach within the contemplation of the parties. The case was one where, because of the impossibility of securing transportation of the same character as that provided in the contract, the injured party could not perform the contract at all at the expense of the other, and was remitted to the same measure of damages which he would have had if he had not attempted to carry his salt to Chicago after defendant's default; that is, to the difference between the market values of the salt at Chicago and at Bay City, less the amount of the freight fixed by the contract. This is the only theory upon which the conclusion in that case can be explained. While Mr. Justice Campbell uses language which might seem to imply that the only measure of damages in any case for the breach of freight contracts is that derived from market values, he refers to the rule laid down in the case of Le Blanche v. Railway Co. as authority for his conclusion, and states the principle there laid down as applicable to the facts before him.

An examination of the authorities shows that in all cases where the measure of damages for a failure or refusal of a carrier to receive goods tendered for shipment under a contract has been held to be the difference between the market value of the goods at the destination and their market value at the point of shipment, less the contract price of the freight, the shipper has not attempted to perform the contract by procuring transportation by other means. Bracket v. McNair, 14 Johns. 170; O'Conner v. Forster, 10 Watts, 418; Bridgman v. The Emily, 18 Iowa, 509; McGovern v. Lewis, 56 Pa. St. 231; Pennsylvania R. Co. v. Titusville & P. Plank Road Co., 71 Pa. St. 354. But where the goods, not received by the contracting carrier, are transported by another at a higher rate than the contract price, this measure is not adopted. In such a case

the goods, it may be, are brought at the same time into the same market, and sell for the same market price as if carried under the contract, but it costs more to get them there. Under these circumstances, neither reason nor authority leaves any doubt that, within the limitation already referred to, that the substituted means of transportation shall be reasonable, and not extravagant, the measure of damages is the difference between the contract and the actual price of freight. The Rossend Castle, 30 Fed. Rep. 462; Lord v. Strong, 6 Mich. 61; The Flash, 1 Abb. Adm. 119; Featherstone v. Wilkinson, L. R. 8 Exch. 122; Grund v. Pendergast, 58 Barb. 216. In Cutting v. Railway, 13 Allen, 381; Spring v. Haskell, 4 Allen, 112; Railway Co. v. Henry, 14 Ill. 157; and Ward v. Railroad Co., 47 N. Y. 29,—cited on behalf of appellants, the goods were actually received by the defendant carrier, but were delayed in the delivery, and the measure of damages was, of course, held to be the difference between the market value of the goods when they should have been delivered and their value when they were delivered. But such cases obviously have no application to cases like that at bar.

It is very clear, therefore, that the measure of damages adopted by the circuit and district courts in these two cases before us was correct. In the months of October and November, when it became entirely certain that the two vessels were going to make but 12 trips, the libelant bought tonnage at the going rate of freight, i. e. 80 cents a ton more than the contract price, and shipped ore enough to make a full cargo for each vessel. This was not substituted performance of the contract by unusual or extravagant means. It was the same method of transportation, and at the same season, as that fixed in the contract. Its cost may, therefore, be properly charged to the defaulting party. As each vessel carried 1,050 tons of ore, the damages chargeable to each under the contract was $840.

The measure of damages adopted can be supported in another way. Ore tonnage between Marquette and the Lake Erie ports west of Erie has a market value, which varies from month to month in the season. Under the construction put upon these charters by the parties, the libelant had the right to sell the tonnage thereby secured to it to any one else, because, with the knowledge of the owners of the vessels, it did sell the tonnage for two trips without objection. Viewing tonnage as a commodity bought and sold, the measure of damages for failure to supply it according to contract would naturally be the difference between the market and the contract prices. Higginson v. Weld, 14 Gray, 165; Ogden v. Marshall, 8 N. Y. 340. The price actually paid by the libelant was the going or market rate of freight, and the damages found by the court below were the difference between that rate and the contract rate.

There remains to consider only the $104 charged against the Palms. This was the profit of 10 cents a ton on one trip of that vessel where the libelant sold the tonnage to Harvey Brown at $1.30 per ton. There is no doubt of libelant's right to sell the tonnage under the charter, because, as already stated, it had been done be-

fore, with the knowledge and consent of the vessel's owners. The captain of the Palms collected the entire freight from Brown, and turned it over to Gilchrist, managing owner of the Palms. The 10 cents a ton, or $104, of the freight belongs to the libelant, and the Palms or her owners should pay the same to the libelant. But the jurisdiction of this court in admiralty to render a decree for the money is denied on the ground that the cause of action is not maritime, but is a mere right to sue for money had and received at common law. As the collection of the $104 was incidental to the execution of the maritime contract sued on, and may be regarded as an overcharge of freight by appellants against appellee under that contract, we think the amount fairly recoverable as damages for its breach, and therefore fully within the admiralty jurisdiction.

The decrees of the circuit court in both cases are affirmed, with interest from their date, at the costs of appellants.