### THE TAMPICO.

### CROSSETT-WESTERN LUMBER CO. v. SUDDEN & CHRISTENSON.

(Circuit Court of Appeals, Ninth Circuit. February 12, 1923.)

#### No. 3910.

**1. Shipping ☞56—Facts held to show subcharterer contracted to carry freight in reliance on charterer's representations.**

Where the charterer of a vessel made a subcharter thereof for one voyage with option for a second voyage, proof that, before exercising its option to undertake the second voyage, the subcharterer inquired as to the date of the expiration of the original charter, and, on receipt of information from the charterer, immediately entered into a contract to transport freight, shows that the contract for transporting the freight was entered into in reliance on the charterer's representations.

**2. Shipping ☞56, 104—Contract held one of affreightment, not subcharter.**

A contract entered into by the subcharterer of a steamship for the transportation of a cargo for a designated voyage for a specified compensation, the subcharterer remaining in possession and control of the vessel, was a contract of affreightment, though it was entitled a charter party, and therefore did not require the consent of the original charterer.

**3. Shipping ☞56—Charterer's silence held consent to contract by subcharterer.**

Where the charterer of a vessel was informed by the subcharterer that it was using the vessel in performance of the subcharterer's obligation to the original nitrate charterers of another steamer and made no objection to such proposed use, its silence should be taken as an assent if assent were necessary.

**4. Shipping ☞56—Repudiation of contract does not terminate it unless other party so elects.**

A repudiation of a subcharter contract by the original charterer does not constitute a breach of the subcharter unless the other party elects so to treat it.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. **Shipping ⚌58(2)—Evidence held sufficient to show damage from breach of charter.**

Evidence that a subcharterer of a vessel entered into a contract of affreightment in reliance upon the charterer's representations as to the expiration of the charter period, that the possession of the vessel was demanded by the owner before the voyage could be completed to the damage of the subcharterer, to which evidence no objection was interposed in the court below and no evidence in contradiction thereof offered, is sufficient to establish damages resulting from the breach of the charter, especially where no assignment of error challenges any ruling concerning the items of the damages.

6. **Shipping ⚌56—Freight for completing transportation held recoverable for breach of charter.**

Where the subcharterer's contract of affreightment required delivery of the cargo in New York if the canal were open when the vessel reached it, or delivery at a Pacific Coast port if the canal were closed, in which event the freight should be $1 per ton less than for delivery at the Atlantic Coast port, was breached by the owner demanding possession of the vessel, not by the canal being closed, the subcharterer's damages are not limited to the $1 per ton freight lost, but it could recover the amount paid for the retransportation of the cargo to the Atlantic Coast which it was required to pay to the cargo owner.

Appeal from the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

Libel in admiralty by the Crossett-Western Lumber Company against Sudden & Christenson, claimants of the cargo of the American steamship Tampico. Decree for respondent on its cross-libel, and libelant appeals. Affirmed.

Platt & Platt, Montgomery & Fales, of Portland, Or., for appellant.

Ira S. Lillick, of San Francisco, Cal. (Theodore M. Levy, of San Francisco, Cal., of counsel), for appellee.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge. On the former appeal of this case, 270 Fed. 537, this court reversed the decree of the court below and remanded the cause for further proceedings, holding that as between the appellant and the appellee herein, the former was estopped by its own representations which were intended to be and were relied upon, to assert its own lack of authority to permit the appellee to send the steamer Tampico upon a second voyage. The facts found were that the steamer had been chartered by the owner to the appellant under a charter party to expire July 1, 1916, but with a provision for termination of the same upon written notice given by the owner on or before February 1, 1916; that the appellant subchartered the steamship to the appellee, giving it the use of the same for a stipulated voyage with an option for a second voyage; that on December 31, 1915, the appellee notified the appellant that it intended to exercise its option for the second voyage; that on January 7, 1916, the owner gave the appellant notice to deliver the vessel by May 15, 1916; that on January 11, the appellant notified the appellee of this demand. But in the meantime, the appellee, for the

purpose of determining whether it would exercise its said option, had demanded of the appellant information as to the length of time covered by the charter party from the owner, to which the answer was in substance that it expired on June 15, 1916; that relying on this information, the appellee had made arrangements with W. R. Grace & Co. for a second voyage before it received the notice from the appellant that the owner had demanded redelivery of the vessel; that the owner interfered with that second voyage, and prevented the delivery of a cargo which was being carried from a port on the west coast of South America to an Atlantic port, thereby causing the damages which were claimed in the appellee's cross-libel.

The record on the former appeal did not make it clear that, at the time when the appellee received notice that the owner under the terms of the original charter demanded redelivery, the negotiations between the appellee and W. R. Grace & Co. had proceeded to a point at which the vessel had become bound for the second voyage. It was for that reason that the cause was remanded to the court below with instructions to ascertain and adjudge the amount, if any, to be awarded to the appellant herein upon the issues created by the libel and the answer, and the damages, if any, to be awarded to the appellee herein under the cross-libel, and to enter a decree accordingly, and we gave permission to take further testimony upon those issues. Upon the proceedings so had, the court below found that the obligation of the appellee to Grace & Co. to transport nitrate to the Atlantic Coast on the Tampico if the canal were open at the time when the Tampico was ready to sail from the nitrate port, became fixed on January 4, 1916, and that the canal was open on that day, and fixed the amount to be awarded to the appellant for charter hire as $6,015.61, being $8,492.88, the stipulated amount less the sum of $2,477.27 due the appellee on account of off-hire, and fixed the amount to be awarded to the appellee as damages in the sum of $14,851.57. A decree was entered awarding the appellee $8,799.96 with interest at 7 per cent. per annum from May 19, 1916, amounting to $3,666.89. From that decree the present appeal is taken.

[1] The appellant contends that the record contains no evidence that the appellee entered into its contract with Grace & Co. relying on the representations of the appellant. It is admitted that Dearborn & Co. were the New York agents of the appellee for the purpose of chartering the vessel on the Atlantic Coast, and that as such agents it entered into the contract of January 4, 1916, with Grace & Co.; but the appellant contends that there was failure to prove that the agents were informed of the representations of the appellant to the appellee or that they acted in reliance thereon. The sequence of events, if there were no other proof, would of itself be sufficient to show that the contract was made in reliance on the representations of the appellant. Having received those representations, the appellee on December 31, 1915, notified the appellant that it would exercise its option for a second voyage, and immediately thereafter and evidently under instructions from the appellee, the contract was made by the New York agents. It is not conceivable that the agents would have acted without instructions, and it is not conceivable that the appellee would have given the

instruction before being assured by the appellant that there would be time to complete the contemplated voyage within the terms of the original charter party. That the appellee acted on the representations, and that the agents acted upon instructions from their principal, is the only reasonable deduction from the evidence.

[2] Nothing in the record which is here presented leads to a different conclusion from that which was reached on the former appeal, that the contract between the appellee and Grace & Co. was a contract of affreightment and not a subcharter of the vessel. To have been within the restriction against subchartering imposed in the charter party to the appellee, the contract with Grace & Co. must necessarily have been a demise of the ship in which the appellee yielded and Grace & Co. took possession, dominion, and control of the vessel. But although the contract was entitled "Nitrate Charter Party," it was in fact no more than a contract for a designated voyage, to carry for a specified compensation a cargo from one port to another. The appellee remained in possession and control of the vessel, and Grace & Co. were "not clothed with the character or legal responsibilities of ownership." 24 R. C. L. 1092, 1093.

"The courts are not inclined to regard the contract as a demise if the end in view can conveniently be accomplished without the transfer of the vessel to the charterer. It follows accordingly that the presumption primarily is against the demise, and the contract is to be construed as one for an affreightment unless the terms show a clear intendment to the contrary. This presumption is not rebutted by the facts alone that the charterer is to pay the wages of the crew and other expenses of the entire voyage, and to deliver the vessel at destination in good condition at the end of the charter." 24 R. C. L. 1094.

[3] But whatever view may be taken of the nature of the contract between the appellee and Grace & Co., it is fairly inferable that the appellant consented to the execution thereof. On December 20th the appellee wrote to the appellant informing it that in using the Tampico for a second voyage it would be used in performing the appellee's obligation "to the original nitrate charterers of the steamer Eureka." No objection was made to that proposed use of the Tampico, and the silence of the appellant should be taken as assent to the substitution, if assent were necessary.

[4] The appellant points to the fact that on January 10, 1916, and more than a month before the vessel started on the second voyage, it telegraphed the appellee, "Under no circumstances can we allow Tampico to go to Atlantic Coast," and contends that thereby it committed an unequivocal, anticipatory breach of the contract, and that the appellee had no right thereafter to pursue a course of action which would enhance the damages necessarily resulting from the breach so evidenced. The effect of the telegram was to give notice to the appellee that on the return voyage from a South American port, the course of the vessel would be halted if she should attempt to enter the canal on her way to the Atlantic coast. To give such notice of the proposed future conduct of the appellant was not in itself to breach the contract between the appellant and the appellee, the latter not having accepted it as a breach. In 6 R. C. L. 1025, it is said:

"The renunciation itself does not ipso facto constitute a breach. It is not a breach of the contract unless it is treated as such by the adverse party." W. R. Grace & Co. v. Ford Motor Co. (C. C. A.) 278 Fed. 955; Dingley v. Oler, 117 U. S. 490, 6 Sup. Ct. 850, 29 L. Ed. 984; Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Smoots Case, 15 Wall. 38, 21 L. Ed. 107; Wells v. Hartford Manilla Co., 76 Conn. 27, 55 Atl. 599.

[5, 6] The appellant insists that there was no competent evidence of the appellee's damages before the court below, and contends that all the evidence now before this court was here on the former appeal, and that it was then found insufficient to support an award of damages. To this latter proposition we do not assent. It was not on account of the nature of the evidence as to damages that the cause was remanded to the court below for further proceedings. As we have already seen, it was remanded to ascertain whether or not the appellee herein had entered into a binding contract with Grace & Co. prior to January 11, 1916. As to the proof of damages, the record contains evidence in detail of the items thereof and the grounds on which they were computed. To this evidence no objection was interposed in the court below, either as to the competency of the measure of damages, or the knowledge of the witnesses. No evidence was offered to contradict the testimony, or to show that a different measure of damages should have been applied. In addition to this, no assignment of error challenges any ruling or finding of the court below concerning the items of damages. These considerations alone are a sufficient answer to the contention of the appellant. We may add, however, that the principal objection now urged to the items of damages is not well taken. It relates to that provision of the contract of affreightment which fixed the freight at $9 per ton if the cargo were delivered in New York, and $8 per ton if delivered in San Francisco. The appellant's position apparently is that for delivery in San Francisco the appellee could be compelled to pay Grace & Co. damages only on the basis of $1 per ton, the difference between the two rates so fixed. But it was not optional with the appellee to deliver the cargo at San Francisco. The contract required delivery at New York, unless the Canal were closed. The Canal was not closed, and Grace & Co. had the right to assess their damages upon what they lost by the failure of the appellee to comply with its contract. They were required to pay $4.70 per ton for the retransportation of the cargo to the Atlantic Coast, and they charged the appellee accordingly. Said Judge Taft in "The Oregon," 55 Fed. 666, 673, 5 C. C. A. 229, 236:

"Damages for breach of contract should be such compensation as will restore the injured party to the same pecuniary condition that he would have been in, had the contract been performed."

The decree is affirmed