PENDLETON BROS., Inc., v. PEARCE et al.

(Circuit Court of Appeals, Second Circuit. March 1, 1926.)

No. 188.

**1. Admiralty ⚖️112.**

Where original notice of appeal failed to name one of respondents, subsequent notice within season by such respondent supplied any defect.

**2. Admiralty ⚖️112.**

Original notice of appeal, taken out by proctors for respondents without authority, was sufficient on later ratification by respondents.

**3. Admiralty ⚖️105, 109—Circuit Court of Appeals is justified in ignoring defense not raised in answer, nor argued below, nor assigned as error.**

Where excuse assigned by respondents for failure to deliver schooner according to charter was not argued in lower court, and was not raised in answer, and was not assigned as error, Circuit Court of Appeals is justified in ignoring it.

**4. Shipping ⚖️58(2).**

Evidence *held* not to show that repairs to chartered ship, necessitating delay in delivery, were because of latent defects.

**5. Shipping ⚖️58(3)—$6.50 per ton allowed charterers as measure of damages for goods shipped on their own vessel, on owner's failure to deliver chartered ship, will be reduced to $3.75, to correspond to testimony of disinterested witnesses.**

Where charterers, on owner's failure to deliver ship, shipped goods on their own ship, with oral agreement for rate of $6.50 per ton, and disinterested witnesses testified that reasonable rate amounted to $3.38, Circuit Court of Appeals will reduce measure of damages from $6.50, as allowed, to $3.75, per ton.

**6. Shipping ⚖️58(3)—On owner's failure to deliver ship, charterers may recover difference between contract price and rate paid the following spring for transporting goods.**

Where shipowner had failed to deliver ship according to agreement, charterers may recover difference between contract price and rate which they paid on shipment made the following spring of goods intended to be shipped on chartered ship.

**7. Admiralty ⚖️126.**

Expenses of transcript containing irrelevant evidence introduced by appellants will not be allowed to them, though case is reversed.

**8. Shipping ⚖️58(3).**

Measure of damages on owner's failure to deliver ship according to charter is difference between contract price and market price of substitute tonnage.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by Pendleton Bros., Inc., against Lewis H. Pearce and others. From a decree for libelants, respondents Pearce and Badcock appeal. Reversed and remanded.

On appeal from a decree of the District Court for the Southern District of New York, upon a libel in personam in the admiralty, awarding damages against the appellants.

The libel alleged that on August 11, 1916, the libelants chartered the schooner Malcolm Baxter, Jr., to be delivered within a reasonable time for a voyage, Hampton Roads to Bangor, Me., carrying 2,500 tons of coal, and that thereafter the four original respondents became the sole owners of the schooner and assumed the charter; that the respondents failed to tender the schooner within a reasonable time, and because of the delay the libelants were obliged to secure tonnage at advanced rates. The answer denied the allegations of the libel, and alleged as a defense that the charter party warranted that the schooner should be staunch, in order to comply with which warranty the repairs which delayed her delivery became necessary.

Upon the trial it appeared that on August 11th, when the charter was signed, the schooner was in the port of New York discharging, and that one of the owners told the libelants that she was ready to go, except that she must be hauled out and painted. She was thereafter sent to dry dock, where she was examined by a surveyor, who found her in bad condition. In order to maintain her classification, some $50,000 of repairs had to be made, which so delayed her that she was not ready for delivery until the 1st of November. The libelants learned some time in October (just when does not appear) that the vessel was being offered elsewhere on the market, and that she would not be available to them. Thereupon they made various unsuccessful efforts to fix other tonnage sufficient for their purpose. Finally they lifted 1,800 tons of the proposed cargo by a barge called the Iron Queen, in November, 1916.

The Iron Queen was owned by Fields S. Pendleton, or the Pendleton Shipping & Navigation Company, of which Pendleton was president, as he was president of the libelants, and one of its stockholders. E. S. Pendleton, the treasurer of the libelants, was a director of the company. The two Pendletons apparently made an oral agreement for the use of the barge at 10 cents per ton per day, of which no part had been paid 6½ years later, when the trial was on. This rate came to $10,500 for 1,800 tons of

coal, together with about $3,000 for towage and trimming charges, nearly $6.50 per ton. The balance of the coal, 700 tons, was shipped in the spring by a schooner at $5.50 per ton.

All of the libelants' evidence on damages was out of the mouth of E. S. Pendleton, but the respondent proved by disinterested witnesses that there were barges in plenty available in November, 1916, and that the rates between Hampton Roads and Boston varied between $1.80 and $2.25 per ton. For ports further east, Portsmouth and Bangor charges were added, amounting to about 50 per cent. of these rates.

The District Court, at the trial, held that the respondents' failure to deliver was without excuse, and entered an interlocutory decree. The commissioner on the reference based the damages upon the agreed charter hire of the Iron Queen, as to 1,800 tons, and upon the spring rates for the balance. The District Judge confirmed this report, but refused to allow full interest, because of delays in the prosecution of the libel.

Pending the suit, two of the respondents had died. A notice of appeal was filed in the District Court, entitled "Pendleton Brothers, Inc., v. Lewis H. Pearce et al." Later, but within the period limited for an appeal, a second notice of appeal was taken out in the name of Badcock, the other surviving respondent. It also appeared that the original notice of appeal had been taken out by the proctors for the respondents without the authority of Pearce, though, on learning of it, he ratified their action. The libelants moved to dismiss the appeal, because the first notice was void, since it did not name Badcock, and since Pearce could not appeal alone; further, because the second notice, naming Badcock, did not mend this defect, since the first notice was in any case void as to Pearce, having been taken without his authority.

Hunt, Hill & Betts, of New York City (John W. Crandall and Edna Rapallo, both of New York City, of counsel), for appellants.

Fitzgerald, Stapleton & Mahon, of New York City (Avery F. Cushman, of New York City, of counsel), for appellee.

Before MANTON, HAND, and MACK, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1, 2] The motion to dismiss the appeal must be denied. Assuming that the original notice of appeal was insuffi-

cient, because of its failure to name Badcock, his subsequent notice within season supplied the defect. The suggestion that Pearce could not ratify his proctors' appeal, even if originally unauthorized, is so far as we know quite without support in authority, as it is certainly contrary to principle. Why the retainer of an attorney should not be subject to the usual rules of agency we cannot conceive.

[3] Again, we think the District Court was right in awarding damages to the libelants. The excuse now put forward is that the repairs which delayed the schooner's delivery arose from a "latent defect," which was excepted in the charter party. Nothing of the sort was apparently argued below, and the answer does not raise the defense. The eighth article alone approaches it in alleging that the repairs which caused the delay were necessary to make the schooner staunch and seaworthy, as required by the charter party and by the American Bureau of Shipping. There is, however, no hint in the article that the defects were latent, or that the charter party contained such an exception. Finally, the point is not assigned as error. Plainly, therefore, it is an afterthought, which we should be justified in ignoring.

[4] But it is a bad afterthought in any case, because the evidence does not show that the defects repaired were "latent." Proctor, the surveyor, was the most detailed and informed witness on the subject, and his evidence is most unsatisfactory. On his first examination he did not find the schooner in as bad condition as he expected. Later, on dry dock, he found her strained, a defect not observable by "casual inspection," and somewhat of a surprise to him. Whether he had to pull off the ceiling of the ship to find the strains, or whether merely a more thorough inspection was needed, we cannot tell. The issue being plainly not litigated, it would be unfair to upset the result on any such fragmentary showing.

[5] We cannot, however, accept the damages as fixed in the District Court, even after confirmation of the commissioner's report. It is apparent that what has been somewhat euphemistically called a charter between the Pendletons was only made ad hoc, and was not seriously intended to be an obligation of the libelants. The hire was fixed for the purpose of recovery here, and fixed, in our judgment, beyond any fair measure. The only evidence as to going rates in November is that of McNamara and Carlson as to spe-

cific rates, and of E. S. Pendleton simply that the agreed hire of the Iron Queen was fair. We are unwilling to ignore the specific rates given by these apparently disinterested and certainly competent men. Taking the utmost rate to Boston, $2.25, and adding 50 per cent. for Bangor, we get a rate of $3.38 per ton, which in the interest of safety we may raise to $3.75, though that is probably too large an allowance. However, in such a case we prefer to err on the side of the libelants; the breach being unexcused. This figure must include towage, trimming, and other incidental charges, since that is the custom in such charters.

[6] As to the remaining 700 tons, taken in the spring, we confess to more difficulty. The Iron Queen actually lifted her portion; she was available, and we have only to find her value, and, indeed, to find it in the absence of all satisfactory evidence, except that of McNamara and Carlson. To disturb the finding as to the last 700 tons of coal, we must hold that the libelants could in November have found a bottom to lift it, had they used more diligence. True, the same witnesses say that they could, on whom we have relied in fixing the hire for the Iron Queen. Still it remains true that the libelants did not deliver the coal that autumn, a fact we cannot quite ignore, since presumably they wanted to do so. Considering the way in which the case comes up, we are not disposed to disturb the allowance pro tanto. If it be asked how we can consistently refuse to accept the valuation of the Iron Queen's hire, while we accept the finding that no other bottoms were available, we answer that the supposititious charter party between the Pendletons, which is all the libelants present as to values, we regard as colorable, and the evidence that it represented the fair hire as put in to fortify the original effort.

We liquidate the damages, therefore, as follows: Allowance upon 1,800 tons shipped on the Iron Queen, $6,750; allowance for the spring shipment, 700 tons, $3,750—total, $10,500. Hire of the Malcolm Baxter, Jr., $2.15 for 2,500 tons, $5,375. Difference, $5,125. On this we allow interest from say January 1, 1917, to the entry of the decree in the District Court upon our mandate, excising therefrom a period of five years; that is, from February 15, 1918, to February 23, 1923, during which the libelants needlessly allowed the suit to lag.

[7, 8] Of the transcript, over 80 pages are occupied in the cross-examination of E. S. Pendleton before the commissioner. Most of this was quite unnecessary; we decline to allow to the appellants the expense of any part of the cross-examination. The evidence in this court was also quite unnecessary, as the rates in October were irrelevant; this, too, we decline to allow. Otherwise, the appellants are allowed their costs and disbursements. A single question of law arises.

The libelants say that under the rule in The Oregon, 55 F. 666, 5 C. C. A. 229 (C. C. A. 6), Chief Justice Taft laid it down that in such cases it was what the disappointed charterer actually paid and not the market price of substitute tonnage which measures his damages. Nothing could be farther from the truth, or more entirely in the face of the established rule. The court had there before it a case where the charterer paid the going rate, and it was because of this that they allowed it as the measure of his damages. The case itself is sufficient authority, if any be needed, for so well-settled a principle.

Decree reversed and cause remanded for further proceedings in conformity with the foregoing.