**WESTERN CANADA STEAMSHIP CO., Ltd., Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 15004.**

United States Court of Appeals Ninth Circuit.

April 24, 1957.

922

Bogle, Bogle & Gates, C. Calvert Knudsen, Stanley B. Long, Seattle, Wash., for appellant.

George C. Doub, Asst. Atty. Gen., Keith Ferguson, Graydon S. Staring, San Francisco, Cal., Leavenworth Colby, Washington, D. C., Charles P. Moriarty, U. S. Atty., Seattle, Wash., for appellee.

Before LEMMON and FEE, Circuit Judges, and MURRAY, District Judge.

JAMES ALGER FEE, Circuit Judge.

The instant proceeding constitutes an attempt to recover from the United States additional compensation above the charter party rate for use of the vessel allegedly beyond the period of "about 120 days * * * or to the termination of the voyage current at termination date."[1] The trial court held that the employment of the vessel until the end

1. Under the Suits in Admiralty Act, 46 U.S.C.A. § 742.

of the last voyage by the United States was justified by the circumstances and was not in breach of the agreement. The ship was chartered for the purpose of carrying ammunition to Japan during the Korean conflict. The employment of this unusual language in the charter party would indicate that, on the face of the agreement, the Steamship Company is precluded from recovery.

■ The cause was tried at length in the District Court upon testimony, depositions, exhibits and responses to requests for admissions. Findings of fact and conclusions of law were entered, and the decree was for the United States.[2] The record shows the facts.

The SS Lake Sicamous was chartered to the government by Western Canada Steamship Co., Ltd., under the terms above set out. The government was to load and discharge cargo at its own expense. A mutual exception for "restraint of princes, rulers or people" was included. There was a provision that compensation might be adjusted upon demand of the company during the life of the charter. The vessel was delivered on August 4, 1950, and returned at the termination of the voyage current at the termination date. The time consumed was 192 days, 13 hours, instead of the estimated 120 days.

The Steamship Company complains of a delay of some 11 days in loading for the second voyage at Bangor, Washington, and thereafter of some 30 days at Kure, Japan.[3]

■ In view of the knowledge of the company at the time the charter party was entered into as to the conditions under which the vessel was to be operated, there was a contemporaneous construction of the extraordinary clause as to duration noted above and also the clause permitting renegotiation of the charter hire.

The charter of the Lake Sicamous was entered into after the outbreak of the war in Korea. The Steamship Company knew the ship was destined to carry munitions of war for the armed forces engaged in that theatre. There is no doubt that two round trips to the Far East, carrying ammunition to troops engaged in battle, were intended by both parties at the same rate of compensation. The vessel was redelivered at the termination of the voyage current at the termination date. If these words be construed as they stand, the redelivery was accomplished in exact accordance with the clause, and therefore no extra compensation is due.

But the Steamship Company contends that, irrespective of the terms of the charter, the United States is responsible for delays caused by the acts of its agents.[4] While in normal times such documents may be so construed, there were unquestionably surrounding circumstances which were within the contemplation of the parties which must be considered in the interpretation of this particular clause. Some of these have been mentioned above. The fact that a clause permitting the United States to extend the time limit for an additional 120 days was considered and rejected by the parties[5] gives color to the contentions of the Steamship Company. On the other hand, the conditions in the ports of the Pacific, the occupation of Japan and considerations of logistics were forceably brought to the attention of the company before the agreement was entered. Unquestionably, it was understood that such factors might cause

---

2. Such findings of fact are binding upon this Court, unless "clearly erroneous." McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20.

3. There is evidence in the record of further delay of approximately four days, caused by orders to proceed to a different port received at sea. Claim for this delay, if made, was abandoned, and is not pressed on this appeal.

4. See Straits of Dover S.S. Co. v. Munson, D.C., 95 F. 690, 692.

5. This clause was struck out of the standard form charter.

delays in the expected two round voyages to the Far East as an ammunition carrier. Certainly, after the first voyage of the Lake Sicamous was over, it must have been clearly realized by the company. This first voyage used up a great deal more than half of the estimated time, due to the same type circumstances which caused the delays on the second voyage. Some seventy days had been then consumed. The captain who commanded the ship was the employee of the company.

The Steamship Company now complains that, when the ship was in Bangor, Washington, taking on munitions for the second voyage, she was not loaded on shifts around the clock, as the company claims was the custom in the west coast ports, but rather on some days only one or two shifts a day and not at all on week-ends. It does not appear that the company objected then to this manner of loading even though unquestionably, at that time the company realized that the ship would not be back within the time estimated in the charter and would only be redelivered at the end of the second voyage.

The delays in Japan were caused by the failure to discharge immediately the cargo of the ship. The company contends that the ports were overcrowded, that some vessels arriving later were discharged first, and that the ship was used at a storage warehouse because of the lack of facilities ashore.

█ The court found that the ship was discharged in accordance with military priorities then in effect and the urgent needs of the armed forces engaged in hostilities in Korea. The conditions were found in great detail. The knowledge that this ship was to be an ammunition carrier to this theatre of operations binds the company. The delays were compelled by the lawful police and governmental activities of the United States and the United Nations and its member nations in their concerted support and contribution to the Korean war. The charter party contained the clause as to restraint of princes. The company must be held to have contemplated delays caused by the situation. Especially after the first voyage, it must be held the company contemplated such delay and failed to exercise the exclusive method of obtaining an increased compensation.[6]

█ The Steamship Company contends that, since the government knew that the second voyage would go over the 120 day limit, it was bound to see that the loading at Bangor was conducted with the utmost facility, and that the loading should have been continuous twenty-four hours a day, as the company claims was the custom in west coast ports. But it was just as obvious to the company that the second voyage would overrun the estimated time. The captain, its employee, was in charge of the ship while it was loading at Bangor. Under these circumstances, the company should have applied for renegotiation of the charter here under Article 29 of the charter party.[7] How-

6. See The Oregon, 6 Cir., 55 F. 666, 670, where the court said: "We may infer, from the fact that the two contracts were executed about the same time, and for the same purpose, that the parties expected the propeller named in one to tow the schooner named in the other, although there is no such express provision in either. The Oregon towed the Palms throughout the season. The libelant had full notice of it, and did not object. This is a practical construction of the contract by the parties that is quite conclusive." See also The Sirius Star v. Sturgeon Bay Shipbuilding & Dry Dock Co., 7 Cir., 196 F.2d 479, 480–481.

7. It is true that on January 19, 1951, a letter dated January 17 from the company, giving notice of intention to claim increased rates for the period in excess of 120 days, the amount to be agreed upon at a later date, was transmitted by the agent of the company to the M.S.T.S. This letter, however, does not comply with Article 29 of the charter party, in that, inter alia, it failed to "specify a date * * * on which any resulting revision of the rate of hire shall be effective."

ever, the company did not file a protest. It must therefore be believed that the company gambled deliberately upon allowance of increased compensation by administrative or court action after the voyage was completed, to be calculated as of a time when it was almost certain the going rate would be higher than it would have been when the ship was at Bangor.

It is of interest to note the record shows that, after the voyage, a claim for increased compensation was filed with the contracting officer and with the Comptroller General. The latter refused additional compensation on three grounds, which seem quite convincing. These were: (1) that the company consented to the sailing of the Lake Sicamous on the second voyage and failed to protest, although it was apparent the estimated time would be exceeded, (2) that the delay was caused by unanticipated conditions of war, and (3) that the company had not complied with the method of compensating it by increasing charter hire.

While this does not determine the questions which are before this Court, it does throw light on the attitude of the company. Technically also, the failure to protest and seek an increase under Article 29 assists in determining that the parties construed the clause requiring return at the end of the voyage current at termination date as binding, notwithstanding delays. An attempt to renegotiate the compensation under Article 29 during the life of the charter was in effect made a condition precedent to any recovery of increased compensation from the government.

It is clearly established that the parties thus adopted a construction of the contract contemporaneously with performance thereunder, which is inimical to the present claim of the company. The latter insists that the established rule of law binds the charterer to pay damages for losses following unreasonable delay in redelivery caused by its fault. On this point, it is met by explicit findings of the trial court which are supported by the record.

Complaint was made that the trial judge disregarded entirely the testimony of one Captain Craig, master of the Lake Sicamous, who said that the delay in loading at Bangor was unreasonable. This witness did not testify that he was familiar with the ammunition depot at Bangor or that he had personal knowledge of the character of operations or conditions there at that time or any time. He further testified he was not familiar with the regulations or restrictions governing the handling of ammunition. It is clear, when he delimited a reasonable time for loading and said the time taken was unreasonable, he was testifying as an expert. An expert opinion is never binding upon the trier of fact. The witness in this case was not qualified to give any opinion on the speed of loading at Bangor. His testimony could be entirely disregarded.

With this introduction, the company nevertheless attacks the finding of the trial judge that the redelivery of the ship to the company "was not delayed by any inexcusable act or omission connected with the loading of her cargo at Bangor." The finding was correct. There was no basis in the evidence for a finding that there was delay at Bangor or that such alleged delay was caused by any improper act or omission of the United States.

The trial court found that the ship was discharged at Kure "as soon as discharging facilities were available, in accordance with military priorities then in effect and the urgent needs of the armed forces engaged in hostilities in Korea." There is abundant evidence in the record to support this finding.

Another set of findings established the facts that all delays were caused by sovereign acts of the United States and the United Nations in the conduct of the Korean war. The circumstances of this delay have been reviewed above in another connection. The evidence supports the finding. In opposition, the com-

pany claims that the delay at Kure was caused by lack of storage facilities ashore and the congestion of the port created by the United States itself. But this is a begging of the question. The specified acts were sovereign in character and unquestionably caused by the exigencies of war, and the evidence is overwhelming on the point. Next, it is said a "priority cargo" system, which gave delivery of rockets for the air force a high priority and a very low priority for artillery ammunition which this vessel carried, was similarly not the result of a sovereign act. The strategic and tactical situations existing at the front undoubtedly required these regulations. There is nothing to the claim that this was merely the basis upon which the United States, as charterer or consignee, determined the order in which it would discharge its supplies from waiting vessels.

Affirmed.